**Andrew Altschul, OSB No. 980302**
E-mail: andrew@baaslaw.com
BUCHANAN ANGELI ALTSCHUL
& SULLIVAN LLP
921 SW Washington St., Suite 516
Portland, OR 97205
Telephone: (503) 974-5015
Facsimile: (971) 230-0337
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **BECKY WRIGHT,** | Civil No. 3:18-cv-1948-YY |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a) AND OPPOSTION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)** |
| **STANDARD INSURANCE COMPANY,** | |
| Defendant. | |

**TABLE OF CONTENTS**

CERTIFICATION .................................................................................................. 1

I.      CROSS MOTION ..................................................................................... 1

II.     INTRODUCTION...................................................................................... 1

III.    STATEMENT OF FACTS........................................................................ 2

        A.  Standard Initially Approves Wright's LTD Claim Based on a Finding That
            Her Depression and Anxiety Are Disabling ............................................... 2

            a.  Wright Expressed Anxiety About her Work Environment Dating Back
                to At Least 2012, Before Her Fibromyalgia Diagnosis ....................... 4

            b.  Wright's Depression and Anxiety Improve, Which Also Results in
                Improvement in Her Pain Levels; a Neuropsychological Evaluation
                Confirms that Depression and Anxiety are Limiting her Work
                Function ............................................................................................ 6

            c.  Wright's Reports Increasing Stress at Work and Home, Coinciding
                with Increased Feelings of Pain and Anxiety on Workdays................. 7

            d.  Wright States Does Not Want to Return to Work and Her Medical
                Providers Recommend a Similar Job with a Different Company....... 10

            e.  As Wright's Scheduled Return-To-Work Date Approaches, Her
                Anxiety and Depression Increases and She Continues to Tell Dr.
                Durtschi She Is Unable to Work ...................................................... 12

            f.  Standard Approves Wright's LTD Claim Based on Her Mental Health
                Conditions...................................................................................... 12

            g.  After Standard Aproves Her Claim, Wright Reports She Can Engage
                in Light Household Tasks and Participate in Physical therapy Despite
                Her Fibromyalgia Pain.................................................................... 14

            h.  Wright's Abdominal pain is Alleviated with Antibiotics.................. 15

            i.  Wright Expresses Interest in a Regular Work Schedule and Volunteer
                Work, Following Reports of a Poor Sleep Schedule and Depression. 17

            j.  Standard Requests Updated Medical Records.................................... 18

            k.  Wright's Physicians review her Pain management Techniques ........ 19

            l.  Standard Notifies Wright That the LTD Policy Contains a 24-Month
                Limitation for Disabilities "Cause or Contributed To" by Mental
                Disorders....................................................................................... 21

            m.  Wright Submits Some Additional Documents and Standard Agrees to
                Review Her Claim........................................................................... 23

            n.  Standard Has Wright's Claim Reviewed by Two Independent
                Physicians ...................................................................................... 24

            o.  Standard Closes Wright's LTD Claim Based on the Policy's 24-Month
                Mental Disorders Limitation............................................................ 25

B.  Wright Appeals and Standard Conducts Further Review of Her Claim... 25
    a.  Standard Upholds Its Decision to Close Wright's Claim .................. 26

**IV.    LEGAL ANALYSIS** ..................................................................... **27**

A.  The Standard of Review............................................................. 27

B.  The 2011 Policy Controls Because Wright Vested in Benefits Under that
    Policy; Therefore, the Standard of Review is Abuse of Discretion .......... 28

C.  Standard's Determination Should be Upheld Under Either Standard of
    Review ..................................................................................... 31
    a.  Standard Did Not Abuse Its Discretion ............................... 31

D.  Standard's Decision is Correct Under a De Novo Review ..................... 36
    1.  Wright Expressed a Hesitancy to Return to Work Beginning 2012,
        Long Before Wright Claims Her Fibromyalgia was Disabling .......... 37
    2.  Somatic Symptom Disorder is Evidenced by Wright's Expressions of
        Pain in Compared to Physical Findings............................... 39
    3.  Wright's Fibromyalgia Pain is Under Control with Medication, and
        Although It Can Be Uncomfortable and Severe at Times, It Is Not
        Disabling Under Standard's "Any Occupation" Definition............... 39

**V.     CONCLUSION** ............................................................. **41**

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Abatie v. Alta Health & Life Insurance Company,* 458 F.3d 955, 962-63, 965, 968-9 (9th Cir. 2006)
  *(en banc)* ................................................................................................ 32, 33, 36

*Bendixen v. Standard Insurance Co.,* 185 F.3d 939 (9th Cir. 1999) ................................. 28

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 834, 838 123 S. Ct. 1965,1971,1972
  (2003) ................................................................................................................ 34, 35

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan,* 410 F.3d 1173,1178 (9th Cir. 2005).......... 32

*Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1510 (10th Cir. 1996)) ..................................... 29, 30, 31, 32

*Conkright v. Frommert,* 599 U.S. 506,521 (2010) ........................................................... 27

*Firestone Tire & Rubber Co. v. Bruch*, 488 U.S. 101, 115 (1989) .................................... 27

*Gibbs ex Rel. Estate of Gibbs v. Cigna Corp.,* 440 F.3d 571, 576-78 (2nd Cir. 2006) .................. 31

*Grosz-Solomon v. Paul revere Life Ins. Co.* 237 F.3d 1154, 1158-60 (9th Cir. 2001)...................... 29, 30, 31

*Hoskins v. Bayer Corp. & Bux. Servs. Long Term Disability Plan.,* 564 F. Supp.2d 1097,
  1108 (N.D. Cal. 2008), aff'd, 362 F. App'x 750 (9th Cir. 2010) ................................. 35

*Jordan v. Northrup Grumman Corporation Welfare Benefit Plan,* 370 F.3d 869, 878, 880
  9th Cir. 2003) ..................................................................................................... 36

*Kearney v. Standard Insurance Company,* 175 F.3d 1084, 1095, 1090 (9th Cir. 1999)*(en banc)* ... 36

*Maurer v. Reliance Standard Life Ins. Co.,* C 08-04109 MMC, 2011 WL 1225702
  (N.D. Cal. Mar. 31, 2011), *aff'd*, 500 F. App'x 626 (9th Cir. 2012) ........................... 36

*McGann v. H&H Music Co.,* 946 F.2d 401 (5th[h] Cir. 1991) ........................................... 29

*McDaniel v. Chevron Corp.,* 203 F.3d 1099 (9th Cir. 2000) ........................................... 28

*Met Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346, 2350 (2008) ................................... 32, 33

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623,630 (9th Cir. 2009)................... 28, 36

*Muniz v. Amec Constr. Mgmt. Inc.,* 623 F.3d 1290, 1294, 1295-96 (9th Cir. 2010) ........................ 37

*Nolan v. Heald Coll.,* 551 F.3d 1148, 1153,1154 (9th Cir. 2009) ..................................................... 31, 32

*Ordway v. Metro. Life Ins. Co.,* 634 F.Supp.2d 1120, 1123 (S.D. Cal. 2007) ................................. 32

*Rabbat v. Standard Ins. Co.,* 894 F. Supp. 2d 1311, 1314 (D. Or. 2012).......................................... 36

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011) ........................ 27, 32

*Shane v. Albertson's Inc.,* 504 F.3d 1166, 1169 (9th Cir. 2007) ....................................................... 30, 31

*Silver v. Exec. Car Leasing Long-Term Disability Plan,* 466 F.3d 727, 733 (9th Cir. 2006) .......... 37

*Tremain v. Bell Industries, Inc.* 196 F.3d 970, 978 (9th Cir. 1999) .................................................. 36

*United States v. Hinkson,* 585 F.3d 1247, 1262 (9th Cir. 2009)(*en banc*) ........................................ 32


<u>Other</u>

Fed.R. Civ. P. 52(a) ....................................................................................................................... 1, 41

OAR 836-010-0026 ......................................................................................................................... 28

In accordance with the Court's November 25 Scheduling Order (ECF 30) Defendant, Standard Insurance Company ("Standard") by and through its undersigned attorney, respectfully submits its Motion for Summary Judgment Or, In the Alternative, Cross-Motion for Judgement Pursuant to Fed. R. Civ. Pro 52(a) and Opposition to Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. Pro 52(a).

## LR 7-1 CERTIFICATION

Pursuant to LR 7-1(a), counsel for defendant Standard certifies that counsel has conferred with plaintiff's counsel.  Plaintiff opposes defendant's motion.

## I.   CROSS-MOTION

Pursuant to Fed. R. Civ. P. 56(a), defendant Standard moves for summary judgment against all claims in plaintiff Becky Wright's Complaint or, in the alternative, Judgment under Fed. R. Civ. P. 52 based on a trail by administrative record.  Although plaintiff moved for judgment under Fed. R. Civ. P. 52 only, defendant asserts summary judgment is the appropriate legal conduit for deciding an Employee Retirement Income Security Act ("ERISA") denial of benefits case under an abuse of discretion standard of review, which, for reasons explained below, should apply in this case.  Even if the court uses a *de novo* standard of review, however, summary judgment may still be the appropriate vehicle to resolve the dispute for the reasons also explained below.  In the alternative, Standard recognizes that, in some circumstances a *de novo* review requires a judgment under Fed R. Civ. P. 52(a).

## II.   INTRODUCTION

This is a somewhat unusual ERISA long-term disability ("LTD") denial of benefits case in that the parties agree that Plaintiff Becky Wright ("Wright") is likely unable to work in "Any

Page 1  -  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Occupation." The dispute in this case is whether Wright's Mental Disorders (including, major depressive disorder, somatic system disorder and general anxiety disorder) "cause or contribute" to her inability to work or whether the impact of her fibromyalgia, alone, even without the existence of her Mental Disorders, disable her from "Any Occupation." Under any standard of review, but particularly under the deferential abuse of discretion standard of review that governs this case, Standard's conclusion that Wright's Mental Disorders "cause or contribute" to her disability should be upheld.

It is undisputed that when Wright ceased working as a Production Planner for Triquint Semiconductor, Inc. ("Triquint") on November 14, 2014 both her treating physicians—her primary care physician (Hyrum Durtschi, M.D.) and her psychiatrist (Marsha Green, M.D.) — opined that but for the impact of her mental disorder she was capable of working in her own light duty occupation, and that she would return to work in a relatively short period of time. Although Wright did not return to work in the years that followed, a close look at her medical records, rather than the impassioned letters of advocacy by Drs. Durtschi and Green that at times completely contradict their earlier medical statements, reveals a lack of evidence that her physical condition deteriorated in any meaningful way from its non-disabling status as of November 2014.

Accordingly, for the reasons explained in more detail below, Standard is entitled to summary judgment or, in the alternative, judgment pursuant to Fed. R. Civ. Pro. 52(a) on Wright's ERISA claim for LTD benefits.

### III.    STATEMENT OF FACTS

**A.    Standard initially Approves Wright's LTD Claim Based on a Finding Tha Her Depression and Anxiety Are Disabling.**

Page 2  -  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Wright was at Triquint as a Production Planner, a light duty job that primarily requires planning and preparing production schedules for manufacturing industrial or commercial products. (Administrative Record ("AR") 996-997; 1016-1020).[1]  As a Triquint employee, Wright was a participant in her employer's group LTD plan which was funded through an insurance policy that Standard issued to Triquint in January 2011, Group Policy 152152-D (the "LTD Policy" or the "2011 Policy").

Leading up to 2012, and while continuing to sustain full-time work at Triquint with occasional short-term disability and medical leave approvals, Wright's medical records show a history that includes, among other ailments, various joint pain, anxiety, kidney stones, attention deficit disorder, fatigue, sleep disorder, gastric bypass surgery, depression, and chronic headaches.  (AR 535-537).  Wright permanently stopped working at Triquint on November 7, 2014 and applied initially for short term disability based on "Anxiety, Fibromayalgia" with an anticipated return date of January 15, 2015.  (AR 994).  When she failed to return her claim was ultimately converted to an LTD claim based on, per her primary care physician's report, fibromyalgia and major depressive disorder.  (AR 510, 663).  Medical records obtained for Wright's 2015 LTD application include: Dr. Durtschi (primary care physician), Dr. Friedman (neurologist), a letter from Dr. Green (psychiatrist), Ms. Swanson (physical therapy), emergency room visit records from Providence Medical Group, Dr. Mason (neuropsychological evaluation), Ms. Freidman (rheumatology clinic) and Dr. Creedon (psychiatry). (*See, e.g.,* AR 510).

---

[1] Standard has filed the Administrative Record as Exhibit 1 to the Declaration of Christopher Powers(Document No. 34). The record is numbered STND 18-04329-000001 to STND 18-04329-002464. For simplicity, references to the AR cite only to the last two to four digits of the numbering.

Page 3  -  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

**a. Wright Expressed Anxiety About her Work Environment Dating Back to At Least 2012, Before Her Fibromyalgia Diagnosis.**

Wright's medical records show a long history of anxiety relating to her employment at Triquint, long before she filed her 2015 LTD disability claim. On March 8, 2012, Wright visited her Naturopathic Physician, Dr. Deborah Rice, for "fatigue and malaise" following a February 2012 pancreatitis surgery. (AR 1602-1603). Although Dr. Rice noted that Wright was "doing much better" following her surgery, Wright told Dr. Rice that she was "a little hesitant" to return to work and it appears that Dr. Rice excused her from work through the end of March. (AR 1602, 1605).

Fibromyalgia is noted for the first time without additional explanation in Wright's March 21, 2013 visit to her primary care physician, Dr. Hyrum Durtschi, in which he describes her condition as "mostly stable" and approves a prescription of oxycodone for headaches and trazadone to help her sleep. (AR 535).

In early June 2013, Wright suffered leg fractures after falling down a 6-8 foot embankment or cliff when hiking on the beach with her husband. (AR 539). When Wright visited Dr. Durtschi for follow up on July 2, 2013, she remained "seated in a wheelchair" with "tenderness," "pain," and "somewhat restricted range of motion," he renewed her morphine pain medication (Dilaudid), and she was "encouraged to begin tapering her Dilaudid as tolerated." (AR 539-540). On August 14, 2013, Wright noted that the pain was "too much" when she tried tapering, that she was feeling "very fatigued," and she was continuing to maintain her Dilaudid regimen without reduction. (AR 541-542). She told Dr. Durtschi that she was "worried how she is going to return to work." Again Dr. Durtschi discussed with Wright "management of fatigue with tapering medication and increasing activity." (*Id.*)

Page 4  -  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

On August 28, 2013, Wright reported "healing well" yet continuing to take Dilaudid three times per day.  (AR 542-543).  She also reported "ongoing pain in the knee" although "does admit to gradual improvement." (*Id.*)  She expressed concerns with returning to work: "[s]he was previously scheduled to start work September 1, but she wonders if she would be ready. (*Id.*)  Her job is primarily working on a computer." (*Id.*)  Her fibromyalgia pain "is not very significant recently." (AR 543).

In October 2013, after returning to work, Wright described an increase in her anxiety with "a couple of panic attacks in the last few weeks." (AR 545-546)  She also noted that she was "very easily distracted" due to her ADD and experiencing "much worse" fibromyalgia pain, requesting "paperwork so that she can go home occasionally when symptoms get worse and work from home for a day or 2. (*Id.*)  She has done this in the past." (*Id.*)

Wright continued to experience symptoms of ADD, anxiety, fibromyalgia, and headaches, and now abdominal pain, into December 2013.  (AR 547-549).  Her fibromyalgia medication was not working well, she was feeling "achy all over," and she and Dr. Durtschi explored alternatives. (*Id.*)  "She does not exercise at all." (*Id.*)  She continued to experience headaches, taking 60 oxycodone per month. (*Id.*)  She voiced concerns that work is "a stressful environment" and that "[s]he feels she may lose her job within the next month." (*Id.*)  She was given a referral to a psychologist "for help with relaxation to treat anxiety and fibromyalgia." (*Id.*)

After taking a trip where she wanted to be active, she took additional oxycodone, 10mg three times per day, which was "remarkably effective" in decreasing her fibromyalgia pain.  (AR 549).  She reduced her oxycodone intake after the trip and again felt "pain in her arms and

Page 5  -  **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

especially in her thighs" more in her muscles than in her joints.  (*Id.*)  Dr. Durtschi noted that

Wright's "anxiety continues to be significant for her" despite taking Wellbutrin during the day

and Trazodone to sleep at night.  (*Id.*)  She found the switch to long-lasting medication for her

ADD to be effective.  (*Id.*)

> **b. Wright's Depression and Anxiety Improve, Which Also Results in Improvement in Her Pain Levels; a Neuropsychological Evaluation Confirms that Depression and Anxiety are Limiting her Work Function.**

On February 6, 2014, Wright noted that her depression and anxiety were "[so]mewhat

better recently" since starting a different anti-depressant, Cymbalta, also resulting in reduced

fibromyalgia achiness and stress.  (AR 551).  Dr. Durtschi instructed Wright on her use of

oxycodone: "I emphasized to her that [oxycodone] really needs to be reserved only for the more

severe headaches, and it is likely to worsen the chronic daily headaches if overused." (AR 552).

On March 3, 2014, Wright reported "[n]ew back pain" that occurred when "at home and

get down to pick something up and had sudden pain in her back. Has now spread throughout her

lower to upper back. . . . Oxycodone helps."  (AR 552).  Dr. Durtschi approved an increase in her

Oxycodone prescription, "up to 4 oxycodone per day now." (Ar 553).

In April 2014, following her reports of decreased cognitive function, Wright underwent a

neuropsychological evaluation with Dr. Mason who provided a detailed report with her findings.

(AR 525-531).  Dr. Mason noted that Wright is a "bright woman" whose emotional functioning

demonstrated "moderate to severe symptoms of emotional distress and anxiety," despite being on

medication for depression and anxiety.  (AR 530).  Wright informed Dr. Mason that her

depression and anxiety is impacted by stress, with increased stress recently due to work conflict,

discord in her four-year marriage, and also increasing tension between her 23-year old daughter

(who lives with her and her husband) and her husband.  (AR 527).  Her self-reported alcohol history included "two to four large drinks of alcohol three to five days per week" and "more frequently" in the weeks leading up to the evaluation.  (*Id.*)  Dr. Mason concluded that "the factors contributing to her cognitive complaints and varied performance on neuropsychological tests can be treated and improved." (AR 530).

On May 6, 2014, Wright visited Dr. Durtschi for foot pain and "worsening" fibromyalgia. (AR 554-555).  He increased her gabapentin medication and again approved an increase in oxycodone to 4 tablets daily if needed. (*Id.*)

Wright returned to Dr. Durtschi a few weeks later on May 29, 2014, complaining of mouth discomfort, with a "burning feeling" and "metallic taste" that "seems to start nearly every day about the time she starts work."  (AR 556-558).  Dr. Durtschi opined that her mouth discomfort "[s]eems to be strongly correlated with work."  (AR 558.).  Wright also reported "feeling disorganized" after a recent reduction in her ADD medication, and Dr. Durtschi increased that prescription to compensate.  (AR 556-558).  The Cymbalta continued to improve Wright's depression, anxiety and fibromyalgia pain. (*Id.*)

On July 3, 2014, Wright met with Dr. Durtschi and continued to report a positive response to Cymbalta and gabapentin for her depression, anxiety, and fibromyalgia.  (AR 558-560).  She showed an interest in water aerobics or swimming for exercise.  (*Id.*)  Dr. Durtschi encouraged her to seek a regular psychologist to treat her Major Depressive Disorder.  (*Id.*)

### c.  Wright Reports Increasing Stress at Work and Home, Coinciding with Increased Feelings of Pain and Anxiety on Workdays.

On August 15, 2014, while continuing to work a regular full-time schedule at Triquint, Wright reported manageable fibromyalgia pain that, although widespread, was "not as limiting

nor distracting." (AR 561-563). Although her depression and anxiety continued to remain manageable, she described "burning discomfort" in her mouth that increases when she is around a difficult co-worker at the office and "if she has been fighting with her husband then symptoms recur." (*Id.*) Headaches and difficulty sleeping remained the same. (*Id.*) She was experiencing some abdominal pain. (*Id.*) Dr. Durtschi prescribed a gradual increase in gabapentin. (AR 563).

Wright began reporting a significant increase in anxiety and fibromyalgia pain on September 14, 2014, with most symptoms occurring on workdays: "Significantly, the symptoms have not been worse or do not occur at all on the weekend." (AR 564). Dr. Durtschi reported that he "does not see significant improvement happening as long as she remains in this [work] environment. That said, it is hard to recommend that she look for another job, as she has been there so many years and does well in her position." (AR 564-565). "I strongly encouraged her to establish with a therapist to work on improved stress relieving techniques." (AR 566).

In October 2014, Wright met with Dr. Durtschi twice, reporting increases in fibromyalgia pain and anxiety. The increases were attributed primarily to stress:

- "Her pain always correlates significantly with stressful work environment. She has a new boss and is facing more frequent deadlines. . . . She feels achy all over, and often by the end of the day is crying." (AR 566).

- "She is rubbing her arms and legs throughout our interview. . . . Tearful, very anxious, dysthymic." (AR 567).

- "She feels she is not succeeding at work, which is a very stressful environment. She does find significant improvement on the weekend." (AR 568).

- "Continues to have a very difficult time at work. She has had episodes in which she has felt foggy and is unable to concentrate. However, these episodes occur only when she is at work. Her pain is worse when she is at work. Concentration difficulties are worse at work. Mood worsens at work, and she has had occasional episodes of sudden tearfulness at work. She is not currently working with a therapist." (AR 568).

Page 8 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

- "Ongoing symptoms of depression, partially treated. Interestingly her symptoms are largely improved on the weekend. There are activities that she enjoys when she is not at work, and pain is also improved when she is not at work." (AR 570).

- "Clearly, stressors at work are a major contributor to her symptoms." (AR 570).

- "We again discussed that medication changes will likely only be partially effective, and so much of what she is experiencing is related to situational stress." (AR 570).

Dr. Durtschi also discussed the possibility of taking time off work, but he "did not think this would be helpful now unless she is already established with a therapist." (AR 570).

On November 5, 2014, Wright told Dr. Durtschi on a follow up visit that a recent appointment with a pain pyschologist, Dr. Marsha Green, was helpful. (AR 571). Dr. Durtschi submitted a letter for a medical leave to allow her time away from work stress while she followed up with Dr. Green, with the intent that she return to work two months later on January 5, 2015. (AR 572-573, 663).

Wright's medical leave of absence began on November 8, 2014. Dr. Durtschi's Attending Physician's Statement lists "disabling depression" in addition to "severe, limiting widespread pain" as the reasons for needing a medical leave. (AR 663).

Wright visited a physical therapist, Brenda Swanson, a few days later, on November 12, 2014, reporting "pain everywhere." (AR 588). Wright described a history of migraines and several fractures and falls dating back to childhood. (AR 590-591, 597). Ms. Swanson noted that "[h]er symptoms are consistent with central sensitization and she would benefit from the persistent pain program." (AR 588). Wright confided to Ms. Swanson during this time that her husband was mentally abusive towards her. (AR 590-591). Wright's StarT test showed that there is a "significant psychosocial component." (AR 594).

Page 9 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Five days later, Wright was admitted to the emergency department of St. Vincent's
Medical Hospital seeking help to control a severe headache after attempting to get relief at home
through oxycodone without success.  (AR 599-603).  The attending physician noted that because
of her "long history of similar headaches" no additional work up needed to be done.  (*Id.*)
Wright was given pain control medication (Decadron – a corticosteriod) and encouraged to
return home to sleep as "an important part of her treatment is likely a good night sleep."  (*Id.*)

Wright followed up with Dr. Durtschi two days later on November 21, 2014.  (AR 573-
575).  Wright described her fibromyalgia pain as "decreased somewhat" but "continues to have
significant neck and shoulder and right leg discomfort.  Right leg problems have persisted since a
leg fracture a year ago."  (*Id.*)  Wright's mood is described as fair, although Dr. Durtschi notes
that her "[g]eneralized anxiety disorder" is "worse recently."  (AR 573-574).  She also noted
tremors in both her hands and balance problems although "[s]he denies difficulty moving or
getting moving."  (*Id.*)

### d.   Wright States She Does Not Want to Return to Work and Her Medical Providers Recommend a Similar Job with a Different Company

On December 11, 2014, Wright expressed to Dr. Durtschi that "she feels she is not likely
to be ready to return to work at the end of this period of leave."  (AR 576-577).  Notably, Dr.
Durtschi did not conclude that she was incapable of working, "[s]he is strongly encouraged to
further discuss question of disability with her psychologist," and Wright's therapist told her she
should be looking to return to work, albeit with a different employer: "She says she has spoken
with her therapist, who has suggested she should be looking for a different job.  In the past, pain
has consistently worsened patient has been at work due to the high stress level."  (*Id.*)

Wright visited with a neurologist, Dr. Daniel Friedman, on December 31, 2014, to follow up on her history of lifelong headaches. (AR 617-618). Dr. Friedman noted "some numbness in her hands as well as loss of balance," recommending an MRI. (*Id.*) At her follow up appointment with Dr. Friedman on January 22, 2015, he noted that the MRI showed no evidence of significant spinal stenosis in the cervical spine. (AR615). He also noted that she does have foraminal narrowing and he recommended trying wrist splints to see if it helps. (*Id.*).

Wright's primary care physician Dr. Durtschi submitted a letter to Standard in early January 2015 in support of Wright's pending LTD claim through "at least 15 February, 2015." (AR 632). Wright's psychologist, Dr. Green, also submitted a letter of support in January, 2015, although she stated that she was "unable to speak to whether or not she continues to qualify for disability." (AR 626). Instead, Dr. Green confirmed that Wright had been diagnosed with the following psychological conditions: "Major Depressive Disorder, Recurrent, Moderate; Somatic Symptoms Disorder, with Predominate Pain, Persistent, Moderate; Generalized Anxiety Disorder, Chronic, and Insomnia Disorder." (*Id.*)

Dr. Green emphasized that, from her perspective, "[i]t is important not to characterize chronic pain as being '*either* medical *or* psychological' but rather a situation wherein both medical and psychological factors can exacerbate, maintain, and/or reduce symptoms." (AR 626; emphasis in original). Dr. Green added that while "Wright's condition is likely to improve with treatment…[g]iven her report of a variety of stressors affecting her current pain symptoms, including occupational and medical stressors, it should be noted that her pain flare may continue until stressors abate." (AR 626).

Page 11 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Wright visited Dr. Durtschi's office again in January 21, 2015, reporting a week and a half of diarrhea and abdominal pain.  (AR 579-582).  She also requested an early refill of her oxycodone for an upcoming trip to Southern California, which Dr. Durtschi approved.  (*Id.*)  Dr. Durtschi concluded that Wright's abdominal symptoms "suggest the possibility of mild diverticulitis" and he prescribed a 10-day antibiotic.  (*Id.*)

### e.   As Wright's Scheduled Return-To-Work Date Approaches, Her Anxiety and Depression Increases and She Continues to Tell Dr. Durtschi She Is Unable to Work

On February 6, 2015, in a follow up appointment with Dr. Durtschi, Wright complained of "widespread pain" and feeling "completely unable to return to work."  (AR 582).  She also noted that she "hopes to be approved ultimately for Social Security disability."  (*Id.*)  Dr. Durtschi summarily determined that "she remains completely unfit to return to work" due to "debilitating fibromyalgia and chronic pain, complicated by chronic insomnia, depression, and ADD."  (AR 584).  His plan was to "contact her psychologist to discuss her case.  At this point, tentative plan is to extend medical leave for another 90 days.  Unfortunately, prognosis for return to work is poor."  (*Id.*)  Dr. Durtschi sent Standard a letter on September 9, 2015, "recommending extending medical leave through May 1, 2015, with the plan to reevaluate at that time."  (AR 624).  On February 27, 2015, Dr. Durtschi evaluated Wright in a follow up appointment, describing her as disabled and unable to work due to "fibromyalgia and depression, as well as chronic headache."  (AR 587).

### f.   Standard Approves Wright's LTD Claim Based on Her Mental Health Conditions.

On April 1, 2015, Standard referred Wright's file for review by two physicians, a rheumatologist and psychiatrist.  (AR 510, 512).  Dr. Ronald Fraback, a rheumatologist,

Page 12  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

conducted the first review on April 7, 2015.  (AR 503-509).  In addition to reviewing Wright's

medical records, Dr. Fraback also spoke with Dr. Durtschi by telephone.  Dr. Durtschi told Dr.

Fraback that he believed Wright could return to work as a production planner if it was with a

different employer:

> I spoke with Dr. Durtschi by telephone today. He confirmed her fibromyalgia with
> associated symptoms of pain and fatigue. He said there was a significant component
> of anxiety and depression. He said that he did not think that she could return to
> work for her own employer but should be able to perform her usual occupation for
> a different employer in a less stressful work setting.

(AR 506).  Dr. Fraback accepted the diagnosis of fibromyalgia but concluded that Wright's

fibromyalgia diagnosis did not prevent her from working as a production planner: "she should be

able to perform regular sedentary to light level work in a different work setting.  (*Id.*)  I think this

has been the case since the cease work date and is ongoing."  (*Id.*)  Dr. Fraback also noted that

"[m]ental health treatment and minimizing the use of alcohol may also be beneficial."  (*Id.*)

Dr. Esther Gwinnell, a psychiatrist and an independent reviewer who is not an employee

of Standard, reviewed Wright's medical records on April 9, 2015.  (ARA 484-493).  She

concluded that Wright's psychological symptoms and disorders were disabling and impacted

Wright's ability to perform her job duties as a production planner:

> Ms. Wright has major depression, recurrent, moderate. She has an anxiety disorder
> not otherwise specified and has been diagnosed as having somatic symptom
> disorder. In neuropsychological testing, she demonstrated some significant
> impairments which were felt to be related to the intrusion of depression and anxious
> symptoms into cognitive function, and the psychologist noted that Ms. Wright
> would, indeed, have difficulties in her day-to-day function due to these cognitive
> findings. . . . My impression from all this is that Ms. Wright is, indeed, experiencing
> limitations in her ability to function in a work like setting at normal persistence and
> pace. Her pain behaviors would have a negative impact on her ability to interact
> with coworkers beyond giving and taking instructions; and although it does not
> appear, according to Dr. Fraback, that the fibromyalgia would be seen to be
> limiting/restricting Ms. Wright's function, the depression, anxiety, and somatic

Page 13  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE**
**ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R.**
**CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR**
**JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

symptom disorder have had a significant negative effect on Ms. Wright's ability to function in spite of fibromyalgia; she would be unable to complete an ordinary workweek without the intrusion of psychological symptoms.

(AR 487-488).  Dr. Gwinnell did not anticipate substantial changes in Ms. Wright over the next 6-8 months due to the "significant chronicity" to her diagnosis.  (AR 488).  She also found it "noteworthy that Ms. Wright and Dr. Durtschi attributed worsening of symptoms exclusively to the work setting, in spite of findings by Dr. Maron [sic] of significant cognitive difficulties related to anxiety and depression during testing which did not occur in the work setting."  (AR 487).

Standard's senior disability analyst Jenny Krems approved Wright's request for LTD benefits because "limitations and restrictions are supported from her depression and anxiety from her cease work date to the present and ongoing."  Ms. Krems further noted that although Wright has a diagnosis of fibromyalgia, "the records do not support that her limitations and restrictions [from fibromyalgia] are of such a severity to preclude full-time light or sedentary level work."  (AR 719).

### g. After Standard Approves Her Claim, Wright Reports She Can Engage in Light Household Tasks and Participate in Physical Therapy Despite Her Fibromyalgia Pain

Between May and June 2015, Wright visited her physical therapist, Ms. Swanson, five times.  In her progress and therapy notes, Ms. Swanson noted that: Wright continued to feel pain; she was not exercising; she was able to complete household tasks such as cleaning but that it hurt due to not pacing herself; she helps care for two of her grandchildren; and she is able to do "fun things with friends" to feel better.  (AR 475).  Ms. Swanson emphasized to Wright the "importance of avoiding flare ups but staying active" by learning to pace herself.  (AR 481).  Her

Page 14 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

conclusion was that with proper stretching, exercise, and physical therapy, Wright "demonstrates good potential to achieve established goals to address the documented impairments by participating in skilled physical therapy services." (AR 467).

And indeed, Wright told Ms. Swanson she "felt more relaxed" and "less focused on pain," noticing improvements in her pain level when she paced herself. (AR 457). Wright was able to walk for several days on the beach "with less pain and definitely less limping." (AR 449). She continued to struggle with mental tasks, however, such as "time management and managing appts" which led to her missing her aquatic therapy class and not scheduling recommended yoga and persistent pain classes. (*Id.*) Ms. Swanson continued to report that Wright would show improvement "if she can be consistent with her physical therapy appts and follows through with taking the persistent pain class and doing her HEP." (AR 454).

In a follow up appointment with Dr. Durtschi on June 29, 2015, Wright reported that although she continued to feel "widespread pain" she has "seen some improvement in her mood and pain level" with reduced stress, physical therapy, seeing her mental health therapist, and attending persistent pain program classes. (AR 434-436).

### h. Wright's Abdominal Pain is Alleviated with Antibiotics.

On July 24, 2015, on a trip to San Diego, Wright was hospitalized upon experiencing "generalized crampy abdominal pain" and diarrhea. (AR 191-212). No clear reason could be determined for the source of the pain. Her exam and CT scan had conflicting results and "possibly early appendicitis" was considered. (*Id.*) Ultimately, her abdominal pain was attributed to "her IBS or fibromyalgia" and she was released the following day. (*Id.*)

Page 15 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Wright again visited the emergency room at St. Vincent's hospital upon her return to Portland with abdominal pain. (AR 213-226). She was given IV fluids, narcotics, and Zofran. (*Id.*) The primary diagnosis was acute pancreatitis of unclear etiology. (*Id.*) Her pain improved over the course of five-day hospital stay. (*Id.*) Wright requested more oxycodone upon discharge, which the attending physician filled as a "short course prescription . . . but have instructed her to discuss with PCP prior to filling, as she is under a pain management contract." (*Id.*) Notably, the physician also reported that "[t]his patient's other chronic medical problems have been stable." (*Id.*) She followed up the day after her discharge with Dr. Durtschi who noted that the pancreatitis was confirmed by imaging but that the etiology "remains elusive." (AR 384-386).

Wright visited Ms. Swanson, her physical therapist, five times between September 23, 2015 and October 13, 2015. (AR 357-376). Wright began her first visit reporting severe pain radiating down her back and leg, taking almost double her prescribed oxycodone medication (up to ten pills per day) after three weeks of physical therapy reported that her pain was significantly improved and she had returned to her prescribed amount of six oxycodone pills per day. (*Id.*)

On November 10, 2015, Wright met with Dr, Durtschi for a follow up visit. Dr. Durtschi noted sleep concerns, sweating, and excessive diarrhea, concluding that "[i]t is likely that untreated sleep apnea is responsible for some of her symptoms" and that her episodic sweating and loose stools "may be related to deconditioning, obesity, and irritable bowel syndrome, although may also be related to intermittent or ongoing withdrawal from her intermittent use of oxycodone." (AR 356). Dr. Durtschi encouraged Wright to continue her exercise program. (*Id.*)

When Wright visited her gastroenterologist, Dr. Sleven, ten days later,  he prescribed a course of Xifaxan, an antibiotic that assists with IBS-related abdominal pain and diarrhea symptoms.  (AR 137-139).

### i. Wright Expresses Interest in a Regular Work Schedule and Volunteer Work, Following Reports of a Poor Sleep Schedule and Depression.

On January 5, 2016, Dr. Durtschi expressed concerns about Wright's ongoing sleepiness and "lack of motivation to do things" leading to her sleeping most of the day.  (AR 273-275). Wright expressed to Dr. Durtschi that a regular schedule and volunteer work would help her:

> She says what she needs is somebody who will get her out of bed and force her to keep a schedule. She says she has never kept a schedule throughout her life, and things seem to have gotten out of control. She also hurts all over and she requests a refill of oxycodone. She says she doesn't take this on a schedule necessarily, but when she does it makes a world of difference for her function.
>
> She admits she often doesn't get out of bed until the early afternoon. She would like to get involved in some type of volunteer work, and she really enjoys working with kids.

(*Id.*)  No changes in her medication were made, and Dr. Durtschi refilled her oxycodone prescription and "[e]mphasized this should not be taking more than prescribed."  (*Id.*)

A month later on February 8, 2016, on a routine follow up appointment with Dr. Durtschi, Wright continued to report difficulties with her sleep and feeling depressed.  (AR 277-279).  She described being able to remain lightly physically active during the day "with doing household tasks, sorting mail, etc." but that she could not think of any enjoyable recreational activities or hobbies she enjoyed doing.  (*Id.*)  She identified "significant financial stressors" because her husband might be losing her job.  (*Id.*)  Her sleep disorder physician, Dr. Ramseyer, recommended behavioral changes and that it was helping her "get[] out of bed at more consistent hours."  (*Id.*)

Page 17  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

### j.   Standard Requests Updated Medical Records

On March 1, 2016, Standard initiated a request for additional medical information to re-evaluate her "to see if her other conditions are causing any [limitations and restrictions] that would preclude light level work." (AR 718).  At this point, Wright had been out of work for over one year.  (*Id.*)  The next day, Standard mailed two letters to Wright, one requesting updated information regarding her medical condition, including a physician-completed medical questionnaire, and the other requesting information regarding her Social Security disability award.  (AR 784, 786).

On March 9, 2016, Wright met with Dr. Durtschi to review her abdominal pain, which had improved with a course of antibiotics, but symptoms then recurred.  (AR 284-286).  By April 20, 2016, Wright's abdominal pain had improved with another course of an antibiotic, Xifiaxan.  (AR 288-290).  She also reported an improved sleep schedule and reduced chronic fibromyalgia pain.  (AR 288).  Dr. Durtschi encouraged her to continue "engagement with hobbies and modest physical activity within her limitations" and he reduced Wright's gabapentin dosage, her fibromyalgia medication.  (AR 289).  Wright also continued receiving trigger point injections during this time, which she felt provided good relief.  (AR 290).

On May 25, 2016, Wright followed up with Dr. Durtschi.  (AR 293-295).  She reported that her chronic conditions were all stable and that she and her husband "recently took a road trip through the Southwest which she really enjoyed." (*Id.*)  She informed Dr. Durtschi that she would not be able to continue monthly office visits due to health insurance changes.  (*Id.*)  Her husband was laid off from his job the previous day and would be on "catastrophic coverage."

(*Id.*)  Dr. Durtschi confirmed that if Wright's conditions continued to remain stable, she could wait six months before returning for a follow up visit and then in a year.  (*Id.*)

Unfortunately, one week later on June 2, 2016, Wright tripped falling down the stairs in her home.  (AR 296-298).  She arrived at Dr. Durtschi's office in a wheelchair and reported only being able to hobble around at home with difficulty and experiencing pain and swelling in the feet and ankles.  (*Id.*)  After X-rays, Dr. Durtschi diagnosed a "left ankle sprain and right isolated oblique lateral malleolar fracture."  (*Id.*)  She was fitted with a walking boot and encouraged to use a wheelchair for a few weeks.  (*Id.*)  She had a follow up appointment with Dr. Durtschi and Dr. Nelson over the next month, where she reported slow improvement, a stable mood and reduced anxiety possibly due to citalopram medication and did not report any concerns regarding her fibromyalgia pain.  (AR 299-304).

### k.  Wright's Physicians Review her Pain Management Techniques.

Wright was admitted to St. Vincent's Medical Center on July 17, 2016 for acute pancreatitis.  (AR 155-159).  She was provided with oxycodone and Dilaudid for pain control and counseled to avoid alcohol.  (*Id.*)  Her citalopram (anxiety/depression medication) was considered as a cause for pancreatitis but the attending physician resident, Dr. Slaught, thought alcohol was "much more likely" a cause.  (*Id.*)

On September 6, 2016, Dr. Durtschi reviewed Wright's pain management techniques and pain medication guidelines with her.  (AR 308-310).  He "discussed with her my strong belief that pain medications are ultimately not in her best interest."  (*Id.*)  He also noted that despite a "large increase in [oxycodone] dosage her overall level of pain has worsened."  (*Id.*)  He recommended "gradually wearing off of her narcotic pain medications" due to tolerance

Page 19  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

concerns and other risks, and that this would provide her with "the greatest amount of long-term benefit." (*Id.*)

Wright underwent a drug screening on September 26, 2016, which revealed marijuana use. (AR 232-233). She met with Dr. Navnit Kaur one day later for long-term pain management. (AR 265-268). After considering her overall pain levels, Dr. Kaur prescribed a fentanyl patch, a plan to wean her off gabapentin, she was told to discontinue her use of marijuana, wean off Klonopin, and consider increasing Celexa. (*Id.*) He also noted that once he got a better handle on her pain he would have Wright begin therapy and pool therapy. (AR 232-233). Dr. Kaur continued the same plan on October 12, 2017 although Wright was continuing to take oxycodone and she was reminded to stop taking it. (AR 261-264).

Dr. Kaur's office again continued the same plan on October 26, 2016, with an increase in fentanyl. (AR 257-230). Wright reported decreased energy and no exercise (although she also stated that she had a kitten that kept her busy and also awake at night). (*Id.*) PAC Nadine Vandentop at Dr. Kaur's office noted that Wright appeared anxious and she attributed many of Wright's symptoms to significant medication changes: "a lot of her symptoms are still adjusting to coming off short acting medications." (*Id.*) PAC Vandentop also encouraged Wright to begin exercising. (*Id.*)

By November 14, 2016, Wright reported improvement in pain management to Dr. Kaur with fentanyl. (AR 253-256). Wright also reported struggles with anxiety and asked to increase her Celexa medication. (*Id.*) Dr. Kaur reviewed all her medications and did not make any other changes other than an increase in the frequency of Fentanyl patches and approving an increase in

Celexa over the next two weeks.  (*Id.*)  She followed up one month later with Dr. Kaur, on

December 21, 2016, reporting that the medication was effective.  (AR 249-251).

> **l.   Standard Notifies Wright That The LTD Policy Contains a 24-Month Limitation for Disabilities "Cause or Contributed To" by Mental Disorders.**

Like many group disability policies, this LTD Policy limits benefits to 24 months for any

Disability that is "caused or contributed to" by Mental Disorders or Substance Abuse.  (AR25).

The LTD Policy defines Mental Disorders as follows:

> Mental Disorder means any mental, emotional. behavioral, psychological, personality,
> cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or
> syndrome. regardless of cause (including any biological or biochemical disorder or
> imbalance of the brain) or the presence of physical symptoms. Mental Disorder includes,
> but ls not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia,
> psychotic illness, manic depressive illness, depression and depressive disorders, anxiety
> and anxiety disorders.

In a letter dated November 28, 2016, Charlotte Steere, a Disability Benefits Analyst,

advised Wright of the Mental Disorders limitation.  (AR 25, 766-768).  Ms. Steere noted that

because Wright's disability was based on depression and anxiety, her benefits would end on May

6, 2017 unless she was Disabled from "Any Occupation" due to conditions that did not fall under

the Mental Disorder limitation.  (AR 6-7; 766-768.)[2]  Jennifer Gentry, a Standard Disability

Benefits Examiner, followed up with another letter to Wright on December 28, 2016, explaining

that as part of its "Any Occupation" analysis Standard needed her to submit updated medical

information within 45 days.  (AR 746-760).

---

[2] Under the LTD Policy, benefits are payable if the participant is Disabled from her "Own
occupation" in the first 24 months after leaving work.  (AR 6, 11).  In order to receive benefits
after that initial 24-month period, the participant must meet the more stringent "Any Occupation"
definition of Disability.  Thus, in order to receive LTD benefits after May 6, 2017, Wright must
show: (a) that she is Disabled from any Occupation and (b) that her disability is not "caused or
contributed to" by a Mental Disorder.  (AR 6, 11, 25).

Page 21  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R.
CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR
JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

On January 5, 2017, in a follow up appointment with her gastroenterologist, while Wright described continuing symptoms, she also described improvement. She added that a switch to Medicare in May would "remove some of the financial stress that is likely worsening her symptoms." (AR 123-126).

On January 25, 2017, Wright contacted Dr. Kaur's office to report excessive sleepiness and ineffective pain medication. (AR 270). Dr. Kaur switched her medication from fentanyl patches to MS Contin, repeated trigger point injections, and gave Wright a TENS unit. (AR 245-248). On February 16, 2017, Wright reported no side effects and that she was able to stay awake with the MS Contin but that she was not getting the same pain relief that she was getting from the Fentanyl patch. (AR 242-244). PAC Heather Van Houten approved an increase in MS Contin and continued trigger point injections, which seemed to help. (*Id.*)

On February 27, 2017, Wright left a voice message for Ms. Steere at Standard asking "about the 24 month payable period for mental disorders and substance abuse." (AR 909). When Ms. Steere returned her telephone call the next day, Wright stated that she did not receive the December 2016 letter. (*Id.*) Ms. Steere confirmed Wright's mailing address and advised Wright that although the 45-day deadline to submit documents referenced in the December 28, 2016 letter had passed, if she promptly sent in the forms and updated medical release authorizations requested in that letter, Standard may re-open her claim if she was found to be Disabled under the policy. (*Id.*) In absence of any documentation, however, Ms. Steere recommended closure of Wright's claim effective May 7, 2016 for failure to provide documentation for review. (AR 908).

Ms. Steere mailed Wright another copy of the December 28, 2016 letter on March 1, 2017, confirming that without the requested medical documentation needed to review her claim, Standard would close her claim with payment through May 6, 2017.  (AR 763-765).

Wright reported to the St. Vincent's emergency room on February 28, 2017 for abdominal pain.  (AR 186-188).  Wright received one dose of Dilaudid and was discharged after a determination that her abdominal pain was likely "attributed to constipation."  (*Id.*)

On March 19, 2017, Wright met with PA-C Vandentop for a follow up.  (AR 324-236).  Wright "admits her pain is on a more even keel" with long lasting pain medication.  (*Id.*)  She related struggles with sleeping and sleep hygiene and CPAP use was discussed and recommended.  (*Id.*)  Vandentop recommended "[r]egular exercise and stretching will also help with her sleep."  (*Id.*)

### m.  Wright Submits Some Additional Documents and Standard Agrees to Review Her Claim.

On March 27, 2017, Wright completed an Activities and Capabilities Questionnaire.  (AR 312-316).  In it, she reported that her "pain management is somewhat better" although it did not help with break-through pain and her stomach problems "are not under control."  (AR 312).  Wright noted cooking meals at home, paying household bills on a computer, that she participates in some household work such as loading the dishwasher and laundry, that she reads, listens to the radio, watches tv, and sews occasionally.  (AR 313-314).  She described limitations in carrying heavy packages and in driving.  (*Id.*)  She described visiting with friends for 4-6 hours, twice a week, but that sometimes she would cancel her plans with friends and grandchildren "when I don't feel well."  (AR 315).  She also reported that she did not believe she would be able to return to work: "I don't know from one day to another how I'm going to feel."  (*Id.*)

Page 23  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Throughout April 2017, Wright contacted Ms. Steere multiple times to let her know she was working on getting her medical paperwork in to Standard. (AR 904-907). Ms. Steere confirmed as of April 20, 2017, Standard had received sufficient medical documentation to allow it to re-open Wright's claim for review. (AR 902-903). Wright, however, again chose not to submit medical records from her psychiatrist, Dr. Green. (*See* p. 15, fn. 3). On April 21, 2017, Ms. Steere referred Wright's claim for review. (AR 112).

**n.  Standard Has Wright's Claim Reviewed By Two Independent Physicians.**

Cheryn Grant, D.O., an independent physician who is not an employee of Standard, reviewed Wright's updated medical records and issued a Physician Consultant Memo on May 30, 2017. (AR 105-111). Dr. Grant concluded that Wright's conditions were primarily related to Mental Disorders:

> Ms. Wright has a somatic symptom disorder which manifests itself with physical symptoms. She also has issues with anxiety and depression, which, although they are essentially controlled with medication, do make her issues which are physical symptoms worse as she is more likely to notice them and to allow them to cause her to limit herself. If she did not have some depression and/or anxiety, her pain symptoms would undoubtedly be less, and she would be able to function more successfully.

(*Id.*) Dr. Grant further concluded that her somatic symptom disorder was unlikely to change and seems to be "getting worse over the course of time." (*Id.*)

Dr. Kleinkamp, M.D., also an independent physician who is not an employee of Standard, reviewed Wright's claim as well, issuing a Physician Consultant Memorandum on June 14, 2017. (AR 98-104). After carefully reviewing Wright's medical records, Dr. Kleinkamp concluded that there was not a single problem or constellation of problems "of

sufficient severity to limit her from her usual light-level occupation" other than the eight-week

period following her ankle fracture and her hospitalizations for abdominal pain. (AR 101).

> ### o. Standard Closes Wright's LTD Claim Based on the Policy's 24-Month Mental Disorders Limitation.

On July 27, 2017, Ms. Steere Informed Wright that her LTD claim was being closed

based on the LTD Policy's 24-month limitation for Disabilities caused or contributed to by

Mental Disorders: "The available medical records do discuss treatment for general medical

conditions. However, the records do not indicate you have impairment due to these conditions

that would interfere with your ability to work in a Sedentary or Light occupation." (AR 689-

694). She further concluded that somatic symptom disorder was the disabling diagnosis and,

because the policy limits Mental Disorders to 24 months of LTD, she had exhausted her limits

and her claim was denied:

> Information in the claim file supports limitations related to somatic symptom disorder. As somatic symptom disorder is considered a Mental Disorder, this Limit remains applicable. Therefore, as LTD Benefits became payable for Mental Disorders on May 7, 2015, the 24 month period of continuous Disability for this Limit exhausted as of May 6, 2017. As such, we are unable to consider any limitations or restrictions from Mental Disorders for our review of your claim file for the Any Occupation time period.
> * * *
> Therefore, as we have identified available occupations [production planner, purchasing agent]  you are able to perform, you do not meet the Any Occupation Definition of Disability, which became effective May 7, 2017. Because you are not Disabled, your LTD claim has been closed with our payment to you through the date of this letter.

(*Id.*)

> ## B. Wright Appeals and Standard Condcts Further Review of Her Claim

On January 19, 2018, Wright, through counsel, appealed Standard's July 27, 2017

decision to close her LTD claim. (AR 1209-1391). Wright's appeal included a letter from Dr.

Page 25  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

Durstchi, a letter from Wright, a letter from Dr. Green, medical records, and other documents. (*Id.*) Standard forwarded Wright's file to the Administrative Review Unit ("ARU") for an independent evaluation. (AR 680).

After receiving Wright's appeal, Standard had her file reviewed by another independent physician, Darrin Campo, M.D., (Board Certified in Internal Medicine). (AR 1393-1401). Dr. Campo reviewed Wright's medical records, physician consultant memos, and spoke with Dr. Durtschi.. (*Id.*) Dr. Campo concluded that although Wright complained of significant pain, the totality of the physical exams and lab reports do not support a conclusion that she cannot perform a 40-hour work week at a sedentary or light capacity:

> Irrespective of any medical diagnosis, the totality of the medication documentation provided for review countermands the claimant's PCP opinion in regards to significant interference with performing a 40 hour work week at a sedentary or light capacity.
>
> As aforementioned, the totality of the exam findings from the claimant's copious medical documentation summate to findings of fibromyalgia tender points with otherwise unremarkable neurologic or musculoskeletal findings. The claimant's notation of fatigue is not supported by lab evidence or metabolic derangement to further support the claimant's fatigue. Although there is no notation of side effects from the claimant's pain regimen, it is conceivable that the amount of opioid medications taken by the claimant could contribute to fatigue. However, the medical documentation and Dr. Durtschi indicated that the claimant is not experiencing significant side effects from the medication, save for notation of constipation at the higher MS Contin dosage. The claimant's pancreatitis was idiopathic and does not appear to be a chronic pancreatitis.

(AR 1400-01).

### a.  Standard Upholds Its Decision to Close Wright's Claim

In a letter dated March 6, 2018, Christopher Powers, a Senior Disability Review Specialist in the ARU, informed Wright's counsel that he was upholding Standard's initial decision to close her claim:

Page 26  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

We understand your client may continue to be unable to return to work as a result of her mental health status. However, she has received all of the LTD Benefits to which she was entitled to receive for Disability caused or contributed to by a Mental Disorder. We also understand that Ms. Wright may have some ongoing level of pain, fatigue or discomfort as a result of her medical conditions. However, to be eligible to receive LTD benefits after July 27, 2017, the information in her file must support work activity limitations or restrictions which are so severe as to prevent her from performing the demands of Light strength level work activity, irrespective of any impairment she may also have as a result of a condition for which payment of benefits is not limited by the terms of the Quorvo Group Policy.

We do not dispute that a number of your client's symptoms are consistent with a diagnosis of fibromyalgia. However, it is our understanding that individuals with fibromyalgia are generally capable of performing Sedentary to Light strength level work activity on a full time basis. Therefore, we cannot conclude that a diagnosis of fibromyalgia would, in and of itself, prevent her from performing the demands of Sedentary to Light strength level work activity.

(AR 649-687).

## IV.    LEGAL ANALYSIS

### A.  The Standard of Review.

A Court will review a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011).  When the plan does grant discretionary authority, the Court reviews the administrator's decision for an abuse of discretion.  Under the deferential "abuse of discretion" standard, a decision "cannot be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506,521 (2010).  "In other words, where there is no risk of bias on the part of the administrator, the existence of a 'single persuasive medical opinion' supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not

construe the language of the plan unreasonably or render its decision without explanation." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir 2009).

The LTD Policy Printed on 1/27/2011 (the 2011 Policy) is in the Administrative Record as AR1-33.  That is the policy that was in place when Wright filed her 2015 LTD Claim.  There is a dispute, discussed more below, as to whether a policy issued in 2016, after Wright's date of disability, previously submitted into the record in connection with a Motion to Reopen Discovery as Exhibit I to the Declaration of Megan Glor (Docket No. 24)(the 2016 Policy), should apply instead of the 2011 Policy.  Both the 2011 and 2016 Policies contain an explicit grant of discretion in the aptly named "Allocation of Authority" section.  (AR 28). That discretion expressly includes, but is not limited to, "the right to determine . . . Entitlement to benefits." (*Id.*)  *See Bendixen v. Standard Insurance Co.*, 185 F.3d 939 (9th Cir. 1999) (finding identical language sufficient to confer discretion).

Oregon's Department of Insurance issued a ban against discretionary clauses in policies that are "issued or renewed on or after" March 12, 2015.  OAR 836-010-0026.  Thus, if the 2011 Policy controls, as Standard contends, the standard of review in this case is for an abuse of discretion and, if the 2016 Policy controls, as Wright contends, the standard of review is *de novo*. Contrary to Wright's suggestion in her Opening Brief, (Wright's Motion for Judgment Pursuant to Fed. R. Civ. Pro. 52(a) (Docket No. 32) (Wright's Opening Brief) at 23), the Court must resolve this issue to rule on the merits. *See, e.g., McDaniel v. Chevron Corp.*, 203 F.3d 1099 (9th Cir. 2000) (determining the proper standard for reviewing the administrator's decision is "a threshold matter").

**B.  The 2011 Policy Controls Because Wright Vested in Benefits Under that Policy; Therefore, the Standard of Review is Abuse of Discretion.**

Page 28  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

The primary basis for Wright's position that the 2016 Policy should apply—and, in turn, a *de novo* standard of review—is based on a misunderstanding of the holding in *Grosz-Solomon v Paul Revere Life Ins. Co*. 237 F.3d 1154 (9th Cir. 2001). *Grosz-Solomon* involved the reverse situation here: the plaintiff wanted to rely on the policy that was in place at the time she became disabled because that earlier policy had a *de novo* standard or review, and the defendant wanted to rely on amendments to the policy that were in place at the time the decision to stop paying the plaintiff's disability benefits was made because that policy, as amended, had an abuse of discretion standard of review. *Grosz-Solomon*, 237 F.3d at 1158-59.

The court explained that ERISA welfare plans, such as long-term disability plans, in contrast to ERISA pension plans are not required to vest benefits. Instead "[c]ontractual vesting of a welfare benefit … 'is an extra-ERISA commitment that must be stated in clear and express language." *Grosz-Solomon*, 237 F.3d at 1160 (quoting *Chiles v. Ceridian Corp*., 95 F.3d 1505, 1510 (10th Cir. 1996). As a result, if the plan does not have vesting language, the results can be very harsh for the plaintiffs. For example, the court discussed, with approval, a Fifth Circuit case where the plaintiff had AIDS. *Grosz-Solomon*, 237 F.3d at 1160. At the time he filed his claim for benefits the plan had a lifetime benefit cap of $1,000,000. But shortly after he was approved, the plan was amended to cap benefits for AIDS to $5,000. Because the plan did not have vesting language, the plaintiff had no claim to benefits beyond the $5,000. *See McGann v. H&H Music Co*., 946 F.2d 401 (5th Cir. 1991).

Similarly, *Grosz-Salomon* determined that "[n]othing in [the employer's] policy with Paul Revere assured employees that their rights were vested." *Grosz-Solomon*, 237 F.3d at 1160.

Page 29  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

And its holding that the plan in place at the time the disability benefits were denied was "[b]ecause no employees' rights were vested…" *Id.*

Indeed, the Ninth Circuit addressed this exact issue again in a more recent case and expressly rejected Plaintiff's limited reading of *Gross-Salomon.  See Shane v. Albertson's Inc.*, 504 F.3d 1166 (9th Cir. 2007).  In *Shane*, like *Grosz-Salomon*, it was again the defendant, not the plaintiff, who wanted the more recent plan to control, because the plan was amended to add language that would result in an abuse of discretion standard of review.  And the defendant, Albertson's, made the exact argument Plaintiff makes here: that *Grosz-Salomon* held that the plan at the time of denial controls.  But the Ninth Circuit held that this "argument overstates the holding in *Grosz-Salomon*."  *Shane,* 504 F.3d at 1169.  The Court explained that in *Grosz-Salomon,* "the employee's disability coverage claim was governed by the plan in effect at the time the employee's claim accrued because 'nothing in the [employee's policy with the employer] … assured employees that their rights were vested.'"  *Id.* at 1169 (*quoting Grosz-Salomon*, 237 F.3d at 1160).

The earlier policy at issue in *Shane*, however, "unlike *Grosz-Salomon*, … possess[es] clear language establishing that [the plaintiff's] LTD claim '[is] to be provided for under the terms of the Plan in effect at the time of [her] disability[y] commenced.'"  *Shane*, 504 F.3d at 1169.  As a result, in that case, the Ninth Circuit applied the policy in place at the time the plaintiff's disability benefits began.

Here, as in *Shane*, the 2011 policy contains language expressly vesting benefits. Specifically, the policy states that Standard "will pay LTD Benefits according to the terms of the Group Policy in effect on the date you become disabled."  (AR 24)  It adds that Plaintiff's "right

Page 30  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

to receive LTD will not be affected by: (1) Any amendment to the Group Policy that is effective

after you become Disabled; (2) Termination of the Group Policy after you become Disabled."

(*Id.*)  As a result, as in *Shane*, Plaintiff's rights vested and the "terms of the Group Policy in

effect on the date [Plaintiff] became disabled" apply.  (*Id.*); *Shane*, 504 F.3d at 1169*; see also*

*Gibbs ex Rel. Estate of Gibbs v. Cigna Corp.*, 440 F.3d 571, 576-78 (2nd Cir. 2006).

The fact that Standard's claim file makes reference to both policies or refers to the

policyholder by both its name under the 2011 and 2016 policy is immaterial.  (See Wright's

Opening Brief at 22).  Vesting does not turn on what is or is not referenced by the administrator

in the administrative record.  It is controlled exclusively by the plan language.  *Grosz-Solomon*,

237 F.3d at 1160 ("[c]ontractual vesting of a welfare benefit … 'is an extra-ERISA commitment

that must be stated in clear and express language.")  (quoting *Chiles v. Ceridian Corp.*, 95 F.3d

1505, 1510 (10th Cir. 1996).

### C.  Standard's Determination Should be Upheld Under Either Standard of Review.

Regardless of whether the Court Applies the abuse of discretion standard or the de novo

standard of review, the record in this case shows that Standard's decision to close Wright's claim

should be upheld.

#### a.  Standard Did Not Abuse Its Discretion

Abuse of discretion ERISA cases are decided by summary judgment.  *Nolan v. Heald*

*Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("where the ERISA abuse of discretion standard

applies in an ERISA benefits denial case, a motion for summary judgment is merely the conduit

to bring the legal question before the district court and the usual tests of summary judgment,

such as whether a genuine dispute of material fact exists, do not apply.")

Page 31 - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

When, as here, the claims administrator is responsible for both evaluating and funding the disability claim it is said that a "structural" conflict of interest exists. *Abatie v. Alta Health & Life Insurance Company*, 458 F.3d 955, 965 (9th Cir. 2006) (*en banc*); *Met Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008). The presence of this structural conflict, however, does not change the standard of review; it is only relevant "to how a court conducts abuse of discretion review." *Abatie*, 458 F.3d at 965 (emphasis added); *Met Life*, 128 S. Ct. at 2350.

> Where a plan administrator operates under a [structural] conflict of interest . . . a court must weigh the conflict as a factor in determining whether there is an abuse of discretion. [C]onsideration of the conflict can affect judicial review, and a court is required to consider the conflict whenever it exists, and to temper the abuse of discretion standard with skepticism commensurate with the conflict.

*Nolan*, 551 F.3d at 1153. The weight the court assigns to the structural conflict of interest "will depend upon the circumstances of the particular case." *Met Life*, 128 S. Ct. at 2346. For example, the Ninth Circuit explained that:

> [T]he level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by an evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weight a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968-9.

The "test for abuse of discretion in a factual determination … is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we may not merely substitute our view for that of the fact finder." *Salomaa*, 642 F.3d at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). As the Court explained, in addressing this issue, the court considers whether the decision was "(1) illogical, (2) implausible

Page 32  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

or (3) without support in inferences that may be drawn from the facts in the record." *Id.* An administrator does not commit an abuse of discretion merely because "the record may contain evidence that could support a contrary conclusion." *Ordway v. Metro. Life Ins. Co.*, 634 F.Supp.2d 1120, 1123 (S.D. Cal. 2007). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal punctuation omitted).

Here, Standard explained its reasoning based on five physicians' reports. (AR 98-111, 484-493, 503-509, 649-694, 719, 1393-1401). It considered all of the evidence Wright submitted, and when disagreeing with her treating physicians gave reasoned explanations supported by the administrative record. *Id.*[3] Indeed, there is overwhelming support in the administrative record to uphold Standard's position that Wright has received the maximum benefits under the plan for her Mental Disorders, and neither her fibromyalgia, nor any other condition, independently disable her.

- It is undisputed that her mental disorders were the primary reason she could not return to work in 2015; **even her primary treating physician, Dr. Durtschi felt**

---

[3] Despite being represented by (different) counsel during her administrative appeal, it is noteworthy that Wright made the conscious decision not to submit either her mental health records or the decision in her social security award. Of course, because Standard does not dispute that Wright is incapable of working, only the basis why she cannot work, and it is Wright's obligation to provide proof of her claim, contrary to the argument in her Opening Brief, Standard did not abuse its discretion in failing to request the details. Instead, if Wright believes there is something useful in it, she had an obligation to submit it.

Page 33  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

**she could work *in the same job* for a different employer**.  It was Wright's psychologist, Dr. Green, that explained psychological factors, "including occupational … stressors" could exacerbate her pain symptoms, and independent confirmation of her multiple Mental Health Disorders that supported her claim for disability.

- Although occasional physical injuries and hospitalizations have also reasonably limited Wright's ability to work during her initial 24-months of benefits, nothing about those isolated incidents support a sustained finding of disability.  To the contrary, nothing in her medical records support a finding that her physical condition has materially worsened.

- All five physicians who reviewed Wright's records acknowledge Wright's fibromyalgia pain and all ultimately conclude that absent contributions from her mental health disorders, her symptoms from fibromyalgia and any other physical condition do not prevent her from working.

The fact that Wright's treating physicians arguably held a different opinion is not afforded any special weight. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1971 (2003) ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").  Drs. Durtschi and Dr. Green have both written impassioned letters in Wright's support.  But those letters are not supported by their medical notes as detailed above.

And Dr. Green, in particular, contradicts her earlier opinion.  In January 2015, she diagnosed Wright with multiple mental health disorders, is reluctant to opine on her actual disability status, and is quite clear that she believes pain is neither solely physical nor mental. (AR 626).  Yet in January 2017 she retracts one diagnosis (and ignores her others) and claims without medical records to support it that Wright's pain is exclusively physical.  This understandable advocacy is one of the reasons the US Supreme Court rejected the treating

Page 34  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

physician rule in ERISA cases. *Nord*, 538 U.S. at 832 (noting that "a treating physician, in a close case, may favor a finding of "disabled.")

Standard "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," *Id.* at 538 U.S. at 838, 123 S.Ct. at 1972, but, when as here, those opinions were considered and discounted based on contradictory statements by telephone as well as supporting evidence and reasoning to the contrary, there is no abuse of discretion. *See, e.g., Hoskins v. Bayer Corp. & Bus. Servs. Long Term Disability Plan*, 564 F. Supp. 2d 1097, 1108 (N.D. Cal. 2008) ("A plan administrator need not accord special deference to conclusory medical opinions even if offered by a treating physician.") aff'd, 362 F. App'x 750 (9th Cir. 2010).

As the Ninth Circuit has explained in a situation like this one where there is a reasonable difference of opinion regarding the limitations created by a condition, the Court regularly defers to the claim administrator:

> Somebody has to make a judgment as to whether a medical condition prevents a person from doing her work, and the governing instrument assigns the discretion to the claims administrator. With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their ipse dixit cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain. That the administrator ultimately rejects the applicant's physicians' views does not establish that it "ignored" them.
>
> …
>
> That a person has a true medical diagnosis does not by itself establish disability… Sometimes their medical conditions are so severe that they cannot work; sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions. Physicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling. It is not for an appellate court to decide that [a diagnosis] should

Page 35  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

*Jordan v. Northrup Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869, 878, 880 (9th Cir. 2003) (overturned on other grounds in *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009)).

In short, Standard's decision is more than reasonable and must be upheld.  *See, e.g., Maurer v. Reliance Standard Life Ins. Co.*, C 08-04109 MMC, 2011 WL 1225702 (N.D. Cal. Mar. 31, 2011) *aff'd*, 500 F. App'x 626 (9th Cir. 2012) (plan did not abuse its discretion when closing LTD claim after exhaustion of maximum benefits for mental health disorder because evidence in the record supported conclusion that the plaintiff was not independently physically disabled).

**D.  Standard's decision is correct under a *de novo* review.**

Even if the Court determines that the 2016 Policy is the controlling policy, Wright is still not entitled to LTD benefits beyond May 6, 2017 on a *de novo* review.  Under a *de novo* review, the Court's function is to "evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962-63 (9th Cir. 2006) (*en banc*). In conducting a *de novo* review, the Court may decide the case by summary judgment.  *Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).  If, however, the Court finds that it cannot reach a conclusion under the traditional summary judgment standards, then it should decide the issue by trial on the administrative record.  *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012).

In a trial by administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is true. The difference in the questions he is asking of the material may lead the judge to read it differently.

*Kearney v. Standard Insurance Company*, 175 F.3d 1084, 1095 (9th Cir. 1999) (*en banc*).

Under either approach, "the record that was before the administrator furnishes the primary basis for review." *Kearney,* 175 F.3d at 1090. When conducting a *de novo* review of the record, the Court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc*., 623 F.3d 1290, 1295–96 (9th Cir. 2010). The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits. *Silver v. Exec. Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006). Under *de novo* review, however, "the burden of proof is placed on the claimant." *Muniz,* 623 F.3d at 1294.

The administrative record contains ample evidence to conclude that Wright did not meet her burden of proof and accordingly, Standard correctly concluded that her LTD claim should be closed.

### 1. Wright Expressed a Hesitancy to Return to Work Beginning 2012, Long Before Wright Claims Her Fibromyalgia was Disabling.

Wright claims that her fibromyalgia symptoms prevent her from working in any occupation to due to chronic pain. Wright's medical records, however, show that Wright was

hesitant to return to work primarily due to stress factors and other unrelated physical injuries

both before and after her fibromyalgia was diagnosed.

- 3/8/12 – recovery from pancreatitis surgery, hesitant to return to work. (AR 1602-1063).

- 8/14/13 & 8/28/13 – recovery from leg fractures, worried about returning to work, fibromyalgia pain "not very significant." (AR 541-542, AR 543).

- 10/13 – panic attack upon returning to work. (AR 545-546).

- 5/29/14 – burning feeling in mouth related to stress at work. (AR 556-558).

- 9/14-10/14 – anxiety and fibromyalgia pain increased on workdays (notably, fibromyalgia pain not worse or does not occur at all on the weekend). AR 564-568).

- 12/14 – not ready to return to work. (AR 576-577).

- Multiple doctors told Wright she could return to work with a different employer. There is no evidence that Wright made any attempts to look for work.

Her medical records further show that with adequate pain medication, she is able to

function in a variety of activities so long as her depression and anxiety allow her to do so. Those

activities include traveling within the country (AR 293-295, 549, 579-582), walking on the beach

(AR 449), engaging in light household duties (AR 277-279, 313-314, 475), visiting with friends

(AR 315, 475), and caring for her grandchildren (AR 315, 475). At times, Wright has even self-

reported that she would benefit from a "regular schedule" that would require her to get out of bed

every morning: "She says what she needs is somebody who will get her out of bed and force her

to keep a schedule . . . [s]he would like to get involved in some type of volunteer work." (AR

273-275).

When directly asked by Dr. Fraback in April 2015, Dr. Durtschi confirmed that Wright

was able to return to work in her prior position as long as it was for a different company. (AR

Page 38  - **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**

506).  This conclusion was reaffirmed by three physicians: Drs. Frabak, Kleinkamp, and Campo. (AR 98-104, 503-509, 1393-1401).

> **2.   Somatic Symptom Disorder is Evidenced by Wright's Expressions of Pain in Compared to Physical Findings.**

Standard does not dispute that Wright's anxiety, depression, and somatic symptom disorder are disabling, and may continue to prevent Wright from engaging in Any Occupation. (AR 685).  These disorders are emphasized by Wright's neuropsychological exam in which Dr. Maron [sic] found that Wright exhibited functionality limitations due to anxiety and depression. (AR 525-531).  They are further supported by Wright's frequent complaints of pain that do not have clear etiology, such as her recurrent abdominal pain that is often resolved with a course of antibiotics or pain medication and attributed to IBS, constipation, and alcohol usage, and only rarely queried as related to fibromyalgia (AR 138-139, 155-159, 185-188, 191-226, 284-290, 384-386, 579-582) or limitations resulting from physical injuries that are resolved or reduced with regular physical therapy (AR 357-376, 454-481, 588-597).

Despite treatment and medication, and irrespective of her fibromyalgia symptoms and her numerous doctors' encouragement, Wright continues to report a lack of interest in exercising, an inconsistent sleep schedule, and feelings of stress and anxiety by outside factors, all indicators of her continuing depression and anxiety.  (AR 105-111, 484-493).

> **3.   Wright's Fibromyalgia Pain is Under Control With Medication, and Although It Can Be Uncomfortable and Severe At Times, It Is Not Disabling Under The "Any Occupation" Definition of Disability.**

Wright does not take issue with Standard's assessment that her previous occupation of production planner is a light-level position.  Instead, Wright relies primarily on her primary care physician's advocacy on her behalf that, in contradiction to his telephone call with Dr. Frabak in

April 2015, Wright is unable to return at any level work, even sedentary work, as result of her

fibromyalgia symptoms.  Standard does not deny that Wright has fibromyalgia: "a number of

[Wright's] symptoms are consistent with a diagnosis of fibromyalgia.  However, it our

understanding that individual's fibromyalgia [sic] are generally capable of performing Sedentary

to Light strength level work activity on a full time basis." (AR 685).  To qualify under the

Policy, Wright must not be able to perform even light level work in "Any Occupation."[4]

> After reviewing all of the medical records Wright provided, not a single one of the five

physicians could opine that Wright's fibromyalgia prevented her from performing regular work

in a light level capacity.  Specifically, the medical records "did not support levels of pain or

fatigue which would, in the absence of any contribution from Wright's mental health status,

prevent her from performing up to Light strength level work activity in an office-based setting on

a reasonably continuous, 40-hour per week basis." (AR 686).  Therefore, Standard correctly

concluded that Wright's LTD claim should be closed effective May 6, 2017.

///

///

///

///

---

[4] Any Occupation means "any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 80% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation."
Material duties means the "essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonable modified or omitted." (AR 12).

## V.    CONCLUSION

For the foregoing reasons, Standard's Summary Judgment Motion, or in the alternative,

its Cross-Motion for Judgment Pursuant to Fed. R. Civ. Pro. 52(a) should be granted and

Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. Pro. 52(a) should be denied.


DATED: December 30, 2019.          BUCHANAN ANGELI ALTSCHUL &
                                   SULLIVAN LLP


                                   /s/ Andrew Altschul
                                   Andrew Altschul, OSB No. 980302
                                   andrew@baaslaw.com
                                   Telephone: (503) 974-5015
                                   Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing **MOTION FOR SUMMARY JUDGMENT**

**OR, IN THE ALTERNATIVE, CROSS-MOTION FOR JUDGMENT PURSUANT TO**

**FED R. CIV. PRO. 52(a) AND OPPOSITION TO PLAINTIFF'S MOTION FOR**

**JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)**on the following-named persons on

the date indicated below in the manner indicated:

    ☐  mailing with postage prepaid

    ☐  hand delivery

    ☐  facsimile transmission

    ☐  email

    ☒  notice of electronic filing using the CM/ECF system

Megan E. Glor
Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
megan@meganglor.com

Attorneys for Plaintiff

DATED:  December 30, 2019        BUCHANAN ANGELI ALTSCHUL &
                                    SULLIVAN LLP

                                    /s/ Andrew Altschul
                                    Andrew Altschul, OSB No. 980302
                                    Telephone: (503) 974-5015
                                    Attorneys for Defendant