Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212
Telephone: (503) 223-7400
Facsimile: (503) 751-2071

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **BECKY WRIGHT,** | **Case No. 3:18-cv-1948-YY** |
| **Plaintiff,** | |
| v. | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. PRO. 52(a)** |
| **STANDARD INSURANCE COMPANY,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

I.  Introduction ....................................................................................................1

II.  Argument ........................................................................................................4

    1.  The Applicable Standard of Review is *De Novo* ........................................4

    2.  Standard Ignores Case-Specific Evidence Of Bias ......................................7

    3.  Wright Is Entitled To Reinstatement Of Her Claim
        Under Either Standard Of Review ..............................................................8

        a.  Wright's providers agree she is disabled by
            her physical symptoms ......................................................................8

        b.  Standard and its medical consultants ignore
            the nature of fibromyalgia .............................................................10

        c.  Standard presents a slanted, misleading review
            of the record, which documents chronic,
            disabling, severe pain ....................................................................12

        d.  Standard abused its discretion by asserting
            Wright's claim was subject to the Mental
            Disorder limitation .......................................................................27

            1.  Standard's assertions that it considered
                Wright's claim a MH claim and warned her
                of that fact are self-serving and arbitrary ..........................27

            2.  Wright's treating psychologist, Dr. Green,
                told Standard in her 2015 and 2016 letters that
                Wright's therapy had focused upon "pain and
                factors that exacerbate pain." ............................................28

            3.  File review psychiatrist Dr. Gwinnell (2015)
                reached implausible, arbitrary conclusions .........................30

            4.  Standard abused its discretion by relying upon
                file review psychiatrist Dr. Grant's
                assertions (2017) in terminating Wright's Claim ..............31

            5.  Dr. Green's observations and conclusions in
                her January 2018 letter further support the
                24-month limitation is inapplicable to
                Wright's claim ...................................................................32

e.   Standard abused its discretion by relying upon
                Dr. Campo's file review (2018) in denying
                Wright's appeal ................................................................................33

III.    Conclusion ...............................................................................................34

# TABLE OF AUTHORITIES

## U.S. Court of Appeals Cases

*Alday v. Raytheon Co.*, 693 F.3d 772 (9th Cir. 2012)..................................................................5

*Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001) .........................5

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011)..................7 , 34

*Shane v. Albertson's Inc*, 504 F.3d 1166 (9th Cir. 2007) ..........................................................5


## U.S. District Court Cases

*Murray v. Anderson Bjornstad Kane Jacobs, Inc.*,
2011 U.S. Dist. LEXIS 13962 (W. D. Wash., Feb. 10. 2011) ................................................5, 6

*Owens v. Liberty Life Assur. Co.*, 184 F. Supp. 3d 580 (W.D. Ky. 2016).............................. 5

*Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112 (D. Or. 2013) ........................ 6

*Rolf v. Health & Welfare Plan for Emples. of Cracker Barrel Old Country Store*,
25 F. Supp. 2d 1200 (D. Kan. 1998)........................................................................................ 6

*Rustad-Link v. Providence Health & Servs.*, 306 F. Supp. 3d 1224 (D. Mont. 2018)...........5, 6

*Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d. 228 (S.D.N.Y. 2005)................................. 7

*Treves v. Union Sec. Ins. Co., LLC*, 2014 U.S. Dist. LEXIS 11905
(W. D. Wash., Jan. 29, 2014)................................................................................................... 5

## Other Authorities

29 U.S.C. § 1132(a)(1)(B) ....................................................................................................... 4

OAR 836-010-0026 .................................................................................................................. 4

# I. INTRODUCTION

Notwithstanding Standard's convoluted statement,[1] the policy states the dispositive issue:
Whether, at the time of Standard's claim termination in July 2017, Wright was "Disabled" from
"Any Occupation" as the result of "Physical Disease." If she was, she is entitled to reinstatement
of her long-term disability ("LTD") claim. *See* Pl. Mot., pp. 2, 14-15; SR 26 (policy: "No LTD
benefits will be payable after the end of the limited pay period, **unless on that date you
continue to be Disabled as a result of a Physical Disease**...for which payment of LTD benefits
is not limited."), SR 792 (Standard's letter confirming this standard) (emphasis added). Wright
has met her burden of proof.

Like its file review consultants, Standard extracts from Wright's medical record facts that
highlight her depression and anxiety (which are among the most common symptoms of
fibromyalgia) and paints Wright as lazy. Def. Mot., pp. 2-27. Standard omits from its Statement
of Facts copious documentation of Wright's continuing, disabling chronic pain. Standard also
omits important context for many of the records it summarizes. This Response corrects
misstatements and adds relevant facts and context. *See* Section II (3)(c), pp. 12-27, *infra*.

Standard also puts a spin on the applicable standard of review. Plaintiff has shown
review is *de novo*. *See* Pl. Mot., pp. 15-17 and Section II (1), pp. 4-6, *infra*. However, even if
the Court concludes review is to be for an abuse of discretion, it should reject Standard's
arguments regarding application of that standard because Standard ignores case-specific factors
showing its bias. Standard, which has a structural conflict of interest, ignored the "quality and

---

[1] "The dispute in this case is whether Wright's Mental Disorders (including, major depressive
disorder, somatic system disorder and general anxiety disorder) 'cause or contribute' to her
inability to work or whether the impact of her fibromyalgia, alone, even without the existence of
her Mental Disorders, disable her from 'Any Occupation.'" Def. Mot., p. 2.

**PLAINTIFF'S RESPONSE/REPLY - p. 1 of 34**      Megan E. Glor, Attorneys at Law
                                                  707 NE Knott Street, Suite 101
                                                  Portland, OR 97212, 503-223-7400

quantity of the medical evidence" supporting disability; ignored the nature of fibromyalgia; ignored Wright's statement, which was consistent with the nature of fibromyalgia and Dr. Durtschi's opinion; and failed to obtain an independent medical examination despite a medical record – involving both subjective symptoms and mental health symptoms – that established disability. *See* Def. Mot., pp. 32-36; *See also Id.*, pp. 27-28 and Pl. Mot., pp. 22, -31.

Standard and its consultants who never met Wright ignored and downplayed the fact depression and anxiety are common symptoms of fibromyalgia. They arbitrarily rejected the opinions of Dr. Durtschi and Dr. Green, who had treated Wright for years and found her symptoms consistent with, and in proportion to, her diagnoses and chronic and severe pain. Tellingly, Standard omits discussion of the OHSU Fibromyalgia Clinic's evaluation.[2] *See* Pl. Mot., pp. 3-4, 5, 8-9, 12 (Dr. Durtschi), 4-5 (OHSU Fibromyalgia Clinic), 9-10 (Dr. Kaur), 10 (Rod Diehm, LMT).

Dr. Campo, Standard's final file review consultant, admitted after speaking with Dr. Durtschi that his opinion was "somewhat persuasive," but he arbitrarily dismissed it, asserting Wright's medical record lacked specific objective evidence, which could never exist in a fibromyalgia case. *See* Pl. Memo, p. 28 and pp. 11-12, 33-34, *infra*. Rather than reviewing the medical record objectively to discern whether Wright's pain was disabling and consistent with fibromyalgia, Standard's consultants advocated to limit Standard's liability to the policy's 24-month Mental Disorder Limitation. They knew both the treating primary physician and treating counselor concluded Wright's physical symptoms were not overstated. *See e.g.* SR 1219, 1221.

---

[2] The single reference to this fibromyalgia specialty clinic's evaluation simply notes "Ms. Freidman (rheumatology clinic)" without discussion and misstates the provider, who was Carrie A. Schreibman, FNP. Def. Mot., p. 3.

**PLAINTIFF'S RESPONSE/REPLY - p. 2 of 34**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212, 503-223-7400

Standard states the conclusions of its psychiatric file review consultants, Dr. Gwinnell

(2015) and Dr. Grant (2017), but does not analyze their reports. Drs. Gwinnell and Grant recited

extensive documentation of Wright's chronic pain, sleep problems and GI symptoms, but failed

to acknowledge that these symptoms, as well as her depression and anxiety, are common

symptoms of fibromyalgia, the condition Dr. Durtschi determined was disabling. *See* Def. Mot.,

pp. 13-14 (Dr. Gwinnell), 24 (Dr. Grant) and Pl. Mot., pp. 3-4, 5, 8-9, 12 (Dr. Durtschi,

confirming Wright's disabling pain from fibromyalgia). *See also* pp. 30-31 (Dr. Gwinnell),

31-32 (Dr. Grant), *infra*.

Standard urges the Court to rely upon Dr. Green's January 2015 letter, attempting to

capitalize upon her diagnosis of a somatic symptoms disorder. Def. Mot., pp. 33-34. Dr. Green

noted in all three of her letters (2015, 2016, 2018) that Wright had been diagnosed with

numerous painful conditions, including fibromyalgia. She explained that psychotherapy is used

to manage fibromyalgia and that the focus of the therapy she was providing was Wright's pain,

factors that exacerbate pain, and Wright's adaptation to pain. She explained in her final letter

that her diagnosis of a Somatic Symptom Disorder in 2015 reflected that Wright was adjusting to

chronic pain and disability, as she documented in all three letters, and that the diagnosis was no

longer appropriate. Standard claimed the Mental Disorder limitation was in play, but never had a

mental health consultant – or any physician – review Dr. Green's January 2018 letter. The

bottom line is that Dr. Green repeatedly confirmed "she is in pain all of the time." SR 1121.

Given Wright's medical record, replete with evidence of her chronic disabling pain and

primary diagnosis of fibromyalgia, Standard erred and abused its discretion by terminating her

claim, and basing its termination upon cursory file reviews. Standard and its consultants

arbitrarily ignored the nature of fibromyalgia, the longitudinal record of Wright's severe

**PLAINTIFF'S RESPONSE/REPLY - p. 3 of 34**

symptoms and the opinions of her treating providers. Wright is entitled to reinstatement of her

disability claim because she suffers from a disabling "Physical Disease." Accordingly, the Court

should reverse Standard's termination decision and order Standard to reinstate and pay Wright's

claim, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

## II. ARGUMENT

### 1.    The Applicable Standard of Review Is *De Novo*.

As Wright has shown, Standard's policy, and its own documentation, confirm that

effective January 1, 2016, Wright's LTD claim falls under the 2016 policy, which is subject to

Oregon's ban on discretionary clauses, OAR 836-010-0026 ("Prohibition on the Use of

Discretionary Clauses"). *See* Pl. Mot., pp. 22.[3]

Standard argues that the vesting of Wright's right to LTD benefits results in "vesting" of

Standard's right to an abuse of discretion review. Def. Mot., pp. 30-31. Standard's

interpretation is contrary to the 2011 policy. The policy's language vesting the claimant's right

to be paid LTD benefits  (SR 24) is separate from policy's discretionary clause (SR 28-29).

Additionally, the policy provision Standard cites merely provides that the claimant's right to

receive benefits will not be affected by policy amendments that take effect after the claimant

becomes "Disabled." SR 24. Thus, according to the policy, only *Plaintiff's* rights (specifically,

her right to receive benefits), are unaffected by policy amendments.

Even if Standard were correct that "vesting" of plaintiff's rights to benefits automatically results

in "vesting" of Standard's "right" to deferential review, that right could not be considered vested until

the accrual of Wright's claim. Wright's claim accrued in July 2017, when Standard terminated her

---

[3] The fact the 2016 policy contains a discretionary clause is immaterial to this analysis. *See* Def.
Mot., p. 28. Standard's inclusion of the clause violates Oregon's ban.

**PLAINTIFF'S RESPONSE/REPLY - p. 4 of 34**    Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

claim. *See Murray v. Anderson Bjornstad Kane Jacobs, Inc.,* 2011 U.S. Dist. LEXIS 13962, *10-11

(W.D. Wash., Feb. 10. 2011); *Treves v. Union Sec. Ins. Co., LLC,* 2014 U.S. Dist. LEXIS 11905,

*2 (W. D. Wash., Jan. 29, 2014); *Owens v. Liberty Life Assur. Co.,* 184 F. Supp. 3d 580, 584

(W.D. Ky. 2016); *Rustad-Link v. Providence Health & Servs.,* 306 F. Supp. 3d 1224, 1236 (D.

Mont. 2018).

It is Standard that misunderstands the premise of *Grosz-Salomon v. Paul Revere Life Ins.*

*Co.,* 237 F.3d 1154 (9th Cir. 2001). Def. Mot., p. 29. In *Grosz-Salomon,* the Court determined

whether amendments to the policy at issue bound the parties. **No changes in law were at issue.**

As Standard notes, ERISA benefits "are not required to vest" (Def. Mot., p. 29) and do not vest

"unless and until the employer says they do." *Id.* at 1160. Employers may amend or terminate

ERISA welfare benefit plans unilaterally, unless employees have bargained for contractually

vested rights. *Id.* at 1160, fn. 24 (citing *Deboard v. Sunshine Mining and Refining Co.,* 208 F.3d

1228, 1239-40 (10th Cir. 2000) (observing that employers are free to amend or terminate ERISA

welfare benefit plans unilaterally unless employees have bargained for contractually vested

rights, and whether these rights exist is determined by application of general principles of

contract)).

Given those principles, courts are concerned about the possibility plan administrators will

abuse their unilateral power to amend policies, including by doing so despite the existence of

contractually bargained, vested rights. *See, Id; See also Shane v. Albertson's Inc,* 504 F.3d 1166,

1168-1169 (9th Cir. 2007); *Alday v. Raytheon Co.,* 693 F.3d 772, 795 (9th Cir. 2012). Thus,

because this risk only arises when a policy is amended, whereas this case pertains to a change in

the law, the cases cited by Standard, which only policy amendments, are inapposite. *See*

**PLAINTIFF'S RESPONSE/REPLY - p. 5 of 34**

*Rustad-Link, supra*, 306 F. Supp. 3d at 1233 (rejecting insurer's arguments that because the discretionary ban at issue became effective after the plan was issued, it did not void the discretionary clause, and that "to apply the Regulation retroactively would interfere with its vested contract rights ....", and holding, "the Regulation is applied where it was in effect at the time the claim arose…" *Id.* at 1234); *Murray, supra*, 2011 U.S. Dist. LEXIS 13962, at *10-11 (statutes banning discretion apply where the cause of action accrued after enactment of the ban).

There is no merit to Standard's assertion that the "Court must resolve" the issue of standard of review "to rule on the merits." Def. Mot., p. 28. Implicitly, in *McDaniel v. Chevron Corp.*, 203 F.3d 1099 (9th Cir. 2000), the Court did have to reach such conclusion, however, courts in various ERISA-governed benefit cases have concluded that one party would prevail under either a *de novo* review or an abuse of discretion review and thus, not needed to reach a conclusion as to which review standard applies. *See e.g. Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112 (D. Or. 2013) (after stating the parties' positions regarding applicable standard of review, "The Court concludes, however, that it need not determine whether a *de novo* or a heightened abuse-of-discretion standard of review is warranted in this case. Viewing the facts in the light most favorable to Unum, the Court concludes that, even under a deferential abuse-of-discretion standard, Unum's evaluation of the record…was a cursory, superficial paper review. …Accordingly, the Court concludes even under the most deferential review (and, therefore, under either standard of review) the record does not support Unum's denial…"); *Rolf v. Health & Welfare Plan for Emples. of Cracker Barrel Old Country Store*, 25 F. Supp. 2d 1200, 1205 (D. Kan. 1998) ("While resolution of this issue may determine the applicable standard of review, the court need not decide it. The court concludes that the final decision to deny benefits…was reasonable under either an arbitrary and capricious standard or de novo review."). Under either standard of review, Standard's denial decision should be overturned.

**PLAINTIFF'S RESPONSE/REPLY - p. 6 of 34**

2.      **Standard Ignores Case-Specific Evidence Of Bias.**

Standard acknowledges that the Court "must weigh" case-specific factors that tend to show bias

as it "conducts [its] abuse of discretion review" (Def. Mot., p. 32), but then rotely asserts the

"any reasonable basis" test, even though it "is no longer good law." Pl. Mot., p. 18 (quoting

*Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 673 (9th Cir. 2011)). *See* Def.

Mot., pp. 32-33.

Wright has shown through case-specific factors that Standard and its consultants

exhibited bias throughout their claim and appeal review. *See* Pl. Mot., pp. 19-20. **Standard**

**ignored the nature of fibromyalgia and failed to fairly or fully analyze the record,**

including Wright's appeal, which overwhelmingly documented chronic pain, consistent with her

fibromyalgia diagnosis. Standard **failed to obtain an in-person examination** even though

Wright's claim involved both subjective symptoms of fibromyalgia (with the treating provider

fully supporting disability) and mental health symptoms, and Standard's assertion the policy's

mental illness limitation applies. *See* Pl. Mot., pp. 30-31 (quoting, *inter alia, Laurie v. United of*

*Omaha Life Ins. Co.*, No. 3:14-CV-01937-YY, 2017 U.S. Dist. LEXIS 35430, *43-44 (D. Or.

Jan. 23, 2017) ("Moreover, where the diagnosis, such as CFS in this case, is based on subjective

symptoms, it 'can be evaluated more fully through an actual examination than by a mere review

of a patient's medical record.'"); *Sheehan v. Metro. Life Ins. Co.,* 368 F. Supp. 2d. 228, 255

(S.D.N.Y. 2005) ("Courts discount the opinions of psychiatrists who have never seen the patient

for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions

based upon objective findings derived from objective clinical tests, the psychiatrist typically

treats his patient's subjective symptoms… surely Dr. Prati was right in testifying that when a

psychiatrist evaluates a patient's mental condition, 'a lot of this depends on interviewing the

patient and spending time with the patient,...a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.'" (record citations omitted)). Wright's claim involves fibromyalgia, a condition which, according to the CDC, has as among its "most common symptoms" both "depression" and "anxiety." *See* https://www.cdc.gov/arthritis/basics/ fibromyalgia.htm (last accessed Jan. 21, 2020). *See also* SR 1382 (SSA), 868 (American College of Rheumatology criteria). Even Standard lists "mood disturbance" as a fibromyalgia symptom in its "Fibromyalgia Syndrome" statement.  SR 513.[4]

### 3.    Wright Is Entitled To Reinstatement Of Her Claim Under Either Standard Of Review.

#### a.    Wright's providers agree she is disabled by her physical symptoms.

Standard acknowledges Wright suffered and took medical leaves of absence for a constellation of physical conditions (various joint pain, kidney stones, fatigue, sleep disorder, gastric bypass surgery, and chronic headaches) as well as for mental health disorders (anxiety, ADD, depression).  Def. Mot., p. 3.  Indeed, six of the nine conditions cited by Standard – pain, fatigue, sleep problems, chronic headaches, anxiety and depression – are "common symptoms" of fibromyalgia.  https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (accessed 1/21/20). Wright has been diagnosed with fibromyalgia, and four of Standard's file review consultants acknowledged the diagnosis.  SR 535, 1219 (Dr. Durtschi), 516 (OHSU), 501, 488, 100, 1400, (Standard's consultants).

Standard admits Wright and her physicians stated in her applications for STD and LTD benefits that she was disabled by fibromyalgia.  Def. Mot., p. 3 (citing SR 994, 510, 663).

---

[4] Standard's "Fibromyalgia Syndrome" statement (SR 513), is consistent with its efforts to apply the Mental Disorder limitation in disregard of the fact Wright is disabled by a physical condition. The document almost exclusively cites research of a single physician and statements by the ACR made in 1990, while omitting any recent research, the CDC, etc.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

Standard recites from copious medical records that document Wright's severe and chronic pain.

*See* Def. Mot., pp. 2-27; *see* pp. 12-27, *supra* (addressing Standard's slanted review of the

medical record).  Wright's primary care physician, Dr. Durtschi, repeatedly documented

Wright's chronic, severe and disabling pain:

> **November 2014**:  Confirming on Standard's medical leave form that Wright suffered from "[s]ymptoms of chronic pain and anxiety" and that her condition would persist for her "lifetime" (SR 1903) and flare.  SR 1904.

> **February 2015**:  The "chronic problems" "continue to be disabling, and especially because of wide[]spread pain she feels completely unable to return to work." SR 582. "remains completely unfit to return to work" mainly due to "debilitating fibromyalgia and chronic pain" and her "prognosis for return to work is poor."  SR 584.

> **June 2015**:  Wright had "widespread pain as a result primarily of fibromyalgia, complicated by depression, chronic headaches." SR 434.  Wright's depression was "improved recently" (SR 436), yet she remained disabled by chronic pain.  SR 434.

> **March 2016**:  Wright "continues to feel achy and uncomfortable most of the time" (SR 284) and her "Chronic pain and fibromyalgia continues to be disabling." SR 286.

> **March 2016**:  "chronic pain and fibromyalgia," "chronic abdominal pain."  SR 284.

> **September 2016**:  Wright suffered "pain...quite disabling at times."  SR 310.  She was "on permanent disability."  SR 308.

> **April 2017**:  "chronic conditions" include fibromyalgia and IBS.  SR 1233. "on [SSDI]," "still spends about 3 days per week in bed...due to pain."  *Id.*

> **October 2017**:  "chronic pain related to fibromyalgia, and as a result is completely disabled." SR 1272. "...unable to sit, stand, walk, for any consistent amount of time due to pain..." *Id.* "Disabling fibromyalgia," "depression...well controlled."  SR 1274.

Contrary to Standard's misplaced characterization of Dr. Durtschi's January 2018 letter

as an "impassioned" letter that is "not supported by [his] medical notes" (Def. Mot., p. 34), his

assertion Wright is unable to "attend work on a consistent basis due to pain and fatigue" (SR

1219) and the restrictions and limitations he provided were consistent with his own records and

the medical record as a whole. SR 1219.  *See* Pl. Mot., pp. 12 and/or 22-24.

**b. Standard and its medical consultants ignore the nature of fibromyalgia.**

Standard argues Wright was disabled due to a Mental Disorder when she left work in November 2014 and that her physicians predicted she would return to work in a relatively short period of time,[5] and that there is a lack of evidence her physical condition deteriorated after November 2014. Def. Mot., p. 2. Like its consultants, Standard ignores and downplays that Wright suffers classic symptoms of fibromyalgia, which includes among its "most common" symptoms depression and anxiety. *See* p. 8, *supra*. *See also* Pl. Mot., pp. 20-21 (addressing case law, the OSHU Fibromyalgia Clinic's report (SR 516-20), the American College of Rheumatology ("ACR") criteria (SR 868-869) and the Mayo Clinic (SR 870)). It is not surprising Wright was worn down with associated problems of obesity, lack of exercise, and negative effects of pain medications.

Wright's Motion shows Standard's consultants documented her chronic pain and diagnoses, including fibromyalgia, but arbitrarily attributed her disability to stress and depression, which they asserted supported the diagnosis of a Somatic Symptom Disorder. *See* Pl. Mot., pp. 6 (Dr. Fraback, Dr. Gwinnell (2015)), 11 (Dr. Kleikamp, Dr. Grant (2017)), 13-14 Dr. Campo (2018), 22. Having never met Wright, there was no reasonable basis for their assertions her treating physicians were incorrect in concluding she suffered disabling fibromyalgia, particularly in light of her extensive record of chronic pain.

---

[5] Contrary to Standard's assertion, Dr. Green did not state at the outset of disability "but for the impact of her mental disorder she was capable of working in her own light duty occupation" or "that she would return to work in a relatively short period of time." Def. Mot., p. 2. Dr. Green stated that she understood Wright's disability was medical in nature and that treatment may be prolonged. SR 626.

**PLAINTIFF'S RESPONSE/REPLY - p. 10 of 34**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

While it is true Dr. Fraback stated that Dr. Durtschi had told him Wright "should be able to perform her usual occupation for a different employer" (Def. Mot., p. 13)[6], Dr. Durtschi made that statement in April 2015, more than two years before the relevant point in time. By the time Standard terminated Wright's claim in July 2017, Dr. Durtschi had confirmed numerous times that his patient could *not* return to work and had documented her severe symptoms and disability. *See* p. 9, *supra*. By then, Wright had been struggling from chronic pain for 2½+ years despite not working. Dr. Durtschi's opinion she was disabled in 2017 was well founded, based upon years of clinical observation and the fact she had not recovered years after leaving work.

Standard has no response to the fact Dr. Kleikamp (2017) implausibly asserted (after his two-page recital of grueling symptoms and conditions), "I do not see any single problem or any constellation of problems of sufficient severity to limit her from her usual light-level occupation" or that he admitted that, given Wright "has now been off work for 3 years and..shown little change in her symptom complaints,..the prognosis is guarded." *See* Pl. Mot, p. 11 and SR 98-101. Standard argues Dr. Kleikamp's conclusions should be credited under an "abuse of discretion" analysis. Def. Mot., pp. 24-25, 33. However, Standard fails to acknowledge case-specific factors that underscore that his opinion, which disregarded the record as a whole and the nature of fibromyalgia, was arbitrary. *See* Pl. Mot., pp. 18-20.

Standard does not address Dr. Campo's (2018) implausible claims that he rejected Dr. Durtschi's opinion (which he admitted was "somewhat persuasive") based upon a lack of "radiographic assessment of the claimant's pain" or "evidence of significant synovitis" (SR

---

[6] Psychiatrist Dr. Gwinnell (2015) did not opine whether Wright was disabled by her chronic pain, but deferred entirely to Dr. Fraback, asserting, "it does not appear, **according to Dr. Fraback**, that the fibromyalgia would be seen to be limiting/restricting Ms. Wright's function." SR 488 (emphasis added). *See* Def. Mot., p. 13.

**PLAINTIFF'S RESPONSE/REPLY - p. 11 of 34**

1400), even after admitting that Wright had a "long standing history of myofascial pain disorder and fibromyalgia" and "significant pain requiring as much as 130 mg of morphine a day." SR 1400. *See* Pl. Mot., p. 14; *See also*, pp. 33-34, *infra* (addressing the inadequacy of Dr. Campo's appeal review).

Dr. Durtschi's clinical opinion, based upon years treating Wright, is persuasive. It is consistent with Wright's long history of chronic pain and diagnoses of fibromyalgia, multiple injuries, illnesses and surgeries, the fact she has submitted to a host of treatments that have caused significant side effects, including painful injections, and the conclusions of OHSU's Fibromyalgia Clinic. It is also consistent with Dr. Green's conclusions. *See* pp. 28-29, 32-33, *infra*.

### c. Standard presents a slanted, misleading review of the record, which documents chronic, disabling, severe pain.

Standard's summary of Wright's medical record often understates the frequency and severity of her physical symptoms.  It also plucks facts out of context, creating the impression Wright was less affected by physical symptoms than she was:

- **March 2012.  Standard asserts:**

On March 8, 2012, Wright visited her Naturopathic Physician, Dr. Deborah Rice, **for "fatigue and malaise"** following a February 2012 pancreatitis surgery. (AR 1602-1603). Although Dr. Rice noted that Wright was "doing much better" following her surgery, Wright told Dr. Rice that she was "a little hesitant" to return to work and it appears that Dr. Rice excused her from work through the end of March. (AR 1602, 1605).

Def. Mot., p. 4 (emphasis added).

Actually, the "Reason for Appointment" was to "[d]iscuss bladder tx meds." SR 1602. Ten days after gallbladder surgery, Wright had a fever and bowel and urinary elimination problems. *Id.* She was suffering from "easy fatigue" even before the surgery and its complications. SR 1607. In the context of Wright's history, recent surgery and complications, her "fatigue and malaise" and "hestitan[cy]" to return to work are understandable.

/ /

**PLAINTIFF'S RESPONSE/REPLY - p. 12 of 34**

- **March 2013. Standard asserts:**

  **Fibromyalgia is noted for the first time without additional explanation** in Wright's March 21, 2013 visit to her primary care physician, Dr. Hyrum Durtschi, in which he describes her condition as "mostly stable"... (AR 535).

Def. Mot., p. 4.

Actually, whether the result of Standard's records request or an error in transmission, only the very end of Dr. Durtschi's March 21, 2013 office note is in the record. SR 535. Visible on the same page, however, is his April 8, 2013 office note, which documents that fibromyalgia had been an active problem since August 20, 2012. *Id.* The diagnosis was later confirmed by Dr. Durtschi (*see* Pl. Mot., pp. 22-24) and the OHSU Fibromyalgia Clinic (*see id.*, p. 4), and four of Standard's consultants acknowledged it. Pl. Mot., p. 22.

- **June 2013. Standard asserts:**

  In early June 2013, Wright suffered leg fractures after falling down a 6-8 foot embankment or cliff when hiking on the beach with her husband. (AR 539).

Def. Mot., p. 4.

Wright "fell down a 6-8 foot embankment or cliff, landing on the rocks below" and "was airlifted to the local hospital, then taken by air transport to Legacy" where she underwent surgery and was hospitalized for a week. SR 539, 1686. She also suffered a fracture of the distal fibula that did not require surgery. SR 539. On June 24, she reported "severe leg pain" and remained "non-weight bearing" and had suffered hip pain since the fall. SR 1686 (APS Form). Followup surgery was scheduled "in about 3 weeks." AR 540. This was a horrific fall that resulted in severe injuries that plagued Wright for many months.

- **August 2013. Standard asserts:**

  On August 14, 2013, Wright noted that the [leg] pain was "too much" when she tried tapering, that she was feeling "very fatigued," and she was continuing to maintain her Dilaudid regimen without reduction. (AR 541-542). She told Dr. Durtschi that she was "worried how she is going to return to work." Again Dr. Durtschi discussed with Wright "management of fatigue with tapering medication and increasing activity." (*Id.*)

  On August 28, 2013, Wright reported "healing well" yet continuing to take Dilaudid three times per day. (AR 542-543). Her fibromyalgia pain "is not very significant recently." (AR 543).

Def. Mot., pp. 4, 5.

**PLAINTIFF'S RESPONSE/REPLY - p. 13 of 34**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

For context, Dr. Durtschi had noted on July 31, 2013, that Wright's pain from her severe injuries was "very gradually improving," but "headaches have been worse, with neck tightness and strain **from using her walker.**" SR 540 (emphasis added). He noted she had "continued significant distracting pain, inability to drive, inability to walk unassisted." SR 541, SR 1678. By August 15th, Wright had "tried tapering, but it has been very difficult due to increased pain with increasing her activity." SR 541. On August 28th, she was "**becoming very frustrated with not being able to do daily life activities** and is worried how she is going to return to work." SR 542.

Standard's summary omits the first highlighted fact, which shows continued fallout from the severe fall. The second puts her worry in context: She wondered how she would be able to work when she was struggling to manage daily life activities.

Context for Dr. Durtschi's comment that Wright's fibromyalgia pain "is not very significant recently" (SR 543) is also omitted. He had noted on July 31 that the Tramadol Wright was taking for her fall injuries "seems to be helpful, and she notes that she has not had any of her typical fibromyalgia pain." SR 540.

- **October 2013. Standard asserts:**

  In October 2013, after returning to work, Wright described an increase in her anxiety with "a couple of panic attacks in the last few weeks." (AR 545-546). She also noted that she was "very easily distracted" due to her ADD and experiencing "much worse" fibromyalgia pain, requesting "paperwork so that she can go home occasionally when symptoms get worse and work from home for a day or 2. (*Id.*) She has done this in the past." (*Id.*)

Def. Mot., p. 5.

  Standard omits that Wright "continues to work with physical therapy" and "uses a cane or walker at all times." SR 544. Standard omits that the fibromyalgia pain had "worsened significantly since returning to work" and that she "is working with the ergonomics folks at her job to see if a solution can be found." *Id.* Wright was also referred to massage therapy for leg pain. SR 546. Thus, the chart note confirms Wright was suffering chronic pain yet actively seeking both treatment modalities and ergonomic solutions to be able to keep working.

- **December 2013. Standard asserts:**

  Wright continued to experience symptoms of ADD, anxiety, fibromyalgia, and headaches, and now abdominal pain, into December 2013. (AR 547-549). Her fibromyalgia medication was not working well, she was feeling "achy all over," and she and Dr. Durtschi explored alternatives. (*Id.*) "She does not exercise at all." (*Id.*) She continued to experience headaches, taking 60 oxycodone per month. (*Id.*) She voiced concerns that work is "a stressful environment" and that "[s]he feels she may lose her job

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

within the next month." (*Id*.) She was given a referral to a psychologist "for help with relaxation to treat anxiety and fibromyalgia." (*Id*.)

Def. Mot., p. 5.

Dr. Durtschi's December 5, 2013 chart note states, "Patient has a history of widespread pain. Things have been worse recently." SR 547. **Standard includes** his statement that Wright **"does not exercise at all," but omits** the next sentence: **"However, she is fairly active at work** with walking, and at the end of the day she finds herself feeling exhausted and hurting." *Id.* (emphasis added). Standard also omits that "most fibromyalgia tender points are positive." SR 548. Standard includes Dr. Durtschi's referral to a **psychologist,** but omits his plans for a "trial of gabapentin...with goal of improvement in her fibromyalgia **pain** and daily **headaches**" and "referral to pain class and ultrasound for abdominal pain." *Id.* (emphasis added). Standard's summary suggests Wright is simply lazy and emphasizes one mental health treatment but omits three non-psychological pain treatments.

- **January 2014. Standard asserts:**

  After taking a trip where she wanted to be active, she took additional oxycodone, 10mg three times per day, which was "remarkably effective" in decreasing her fibromyalgia pain. (AR 549). She reduced her oxycodone intake after the trip and again felt "pain in her arms and especially in her thighs" more in her muscles than in her joints. (*Id*.)

Def. Mot., p. 5-6.

Contrary to Standard's assertion, Wright increased her oxycodone during her trip (of a "few days"), not after it. She did so "because she wanted to remain active," but reduced her dose thereafter. This was all in the context of fibromyalgia pain that was "somewhat worse recently." SR 549.

- **April 2014. Standard asserts:**

  In April 2014,...Wright underwent a neuropsychological evaluation with Dr. Ma[r]on who provided a detailed report with her findings. (AR 525-531). Dr. Ma[r]on noted that Wright is a "bright woman" whose emotional functioning demonstrated "moderate to severe symptoms of emotional distress and anxiety," despite being on medication for depression and anxiety. (AR 530). Wright informed Dr. Ma[r]on that her depression and anxiety is impacted by stress...

Def. Mot., p. 6.

Dr. Maron also documented Wright's chronic pain: "Ms. Wright endorsed 'bad' pain 'everywhere' in her body and tension headaches. She said that she rubs her arms, neck, shoulders, and forearms so hard that she sometimes leaves bruises." SR 526. Dr. Maron observed obvious signs of pain, including inability to "get comfortable in her chair,"

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212, 503-223-7400

rubbing of her body, grimacing and sighing. SR 530. Dr. Maron linked inconsistency in Wright's test results to both "emotional distress **and pain**." SR 530 (emphasis added). She also recommended Wright be seen at the Fibromyalgia Clinic. SR 531.

- **May 2014. Standard asserts** that in early May:

Wright visited Dr. Durtschi for foot pain and "worsening" fibromyalgia. (AR 554-555). He increased her gabapentin medication and again approved an increase in oxycodone to 4 tablets daily if needed. (*Id*.)

Wright returned to Dr. Durtschi a few weeks later on May 29, 2014, complaining of mouth discomfort, with a "burning feeling" and "metallic taste" that "seems to start nearly every day about the time she starts work." (AR 556-558). Dr. Durtschi opined that her mouth discomfort "[s]eems to be strongly correlated with work." (AR 558.).

Def. Mot., p. 7.

Standard omits "widespread chronic pain" "affecting the legs, hands, arms, back" which is "still very limiting at times" and that Wright "mentions that the neuropsychologist suggested the possibility of the OHSU fibromyalgia clinic." SR 554 (May 6). On exam, Wright's feet demonstrated "point tenderness on the plantar surface." SR 555 (May 6).

On May 29, Dr. Durtschi noted Wright's fibromyalgia pain was improving with gabapentin and Cymbalta. SR 558. He noted her mouth pain was "suggestive of burning mouth syndrome" and recommended ruling out dental issues and considering titrating gabapentin. *Id*. He made no suggestion her mouth pain be treated with mental health care.

Standard omits from its Statement of Facts psychiatrist Dr. Jennifer Creedon's **May 2014**

evaluation. She found very manageable depression, anxiety and clear signs of chronic pain. SR

521-24. Regarding anxiety and depression, Dr. Creedon noted, "currently, she is doing fairly

well... (rating her mood at 7/10), though does endorse significant stress related to her job and

relationship that sometimes get her down." SR 521. She also noted "[s]ome intermittent anxiety

that will come 'out of nowhere,' describes that she will feel like she needs to 'crawl out of her

skin' due to these episodes." *Id*. She noted Wright "[e]ndorse[s] a history of depressive

episodes," but "does not meet criteria...at this time." SR 523.

**PLAINTIFF'S RESPONSE/REPLY - p. 16 of 34**       Megan E. Glor, Attorneys at Law
                                                    707 NE Knott Street, Suite 101
                                                    Portland, OR 97212, 503-223-7400

In contrast, Dr. Creedon documented abundant evidence of chronic pain that interfered with Wright's sleep and daily life. Wright reported her "[s]leep is good, although only when she takes triazolam, if she misses it she reports that she will 'not sleep at all'" and that her "[h]usband reports that she moans in pain during her sleep." *Id.* Dr. Creedon noted Wright "**has chronic pain of multiple etiologies (13 prior surgeries, broken limbs, fibromyalgia) which she reports is present 'everywhere and all the time.'**" AR 521 (emphasis added). Dr. Creedon's clinical opinion was that "[c]hronic pain also appears to significantly impact presentation." SR 523. Mental status examination findings included "wrings hands and rubs on arms frequently throughout interview." SR 523. *See* SR 1219 (Dr. Durtschi, describing Wright as "nearly always in pain," shown by "shift[ing] positions to find some relief," "rub[bing] her arms and thighs," "looks fatigued.").

Dr. Creedon recommended "titrating upwards" Duloxetine (Cymbalta), which she described as "a good choice for addressing depression, anxiety **and chronic pain.**" SR 523 (emphasis added). She also recommended potentially "switching trazodone to a TCA [tricyclic antidepressant] at night" to help with "sleep, depression **and pain,** though would come with additional side effects." *Id.* (emphasis added). Dr. Creedon's report (based upon in-person evaluation) primarily paints the picture of a patient who suffers chronic pain, consistent with the medical record as a whole.

Wright's pain persisted through the summer of 2014. Standard notes that when she saw Dr. Durtschi on **July 3, 2014**, she "continued to report a positive response to Cymbalta and gabapentin for her depression, anxiety, and fibromyalgia. (SR 558-560)." Def. Mot. p. 7. This extract tells part of the story. Wright "**particularly noted leg pain persisting...a little worse on the right**" (SR 559, emphasis added) and reported "**Fibromyalgia, widespread pain**" that had

**PLAINTIFF'S RESPONSE/REPLY - p. 17 of 34**          Megan E. Glor, Attorneys at Law
                                                      707 NE Knott Street, Suite 101
                                                      Portland, OR  97212, 503-223-7400

"responded at least partially" to Cymbalta and gabapentin.  SR 560 (emphasis added).  Dr.

Durtschi endorsed a "[a] sit to stand desk." *Id.*

Standard continues its summary, minimizing Wright's chronic pain and other physical

symptoms:

- **November 2014.  Standard asserts:**

    Wright followed up with Dr. Durtschi...on November 21, 2014.  (AR 573-575).  Wright
    described her fibromyalgia pain as "decreased somewhat" but "continues to have
    significant neck and shoulder and right leg discomfort. Right leg problems have persisted
    since a leg fracture a year ago." (*Id.*)...**She also noted** tremors in both her hands and
    balance problems… (*Id.*).

Def. Mot., p. 10 (emphasis added).

    Actually, Dr. Durtschi **observed** on his "Exam," the tremor and balance problems Wright
    reported.  SR 574.  He noted a "mild bilateral hand tremor" (SR 575) and assessed
    "tremor, difficulty with balance."  *Id.*

Standard's summary of Dr. Durtschi's Attending Physician's Statement authorizing

medical leave in **November 2014** suggests he found Wright *primarily* disabled by depression:

- Standard asserts:

    Wright's medical leave of absence began on November 8, 2014. Dr. Durtschi's Attending
    Physician's Statement **lists "disabling depression" in addition to "severe, limiting
    widespread pain"** as the reasons for needing a medical leave. (AR 663).

Def. Mot., p. 9 (emphasis added).

    Actually, he listed "Fibromyalgia" as Wright's "primary diagnosis" and "MDD" (major
    depressive disorder) as the "secondary diagnosis." SR 663.  He described Wright's
    "restrictions and limitations" as "severe, limiting widespread pain and worsening,
    disabling depression." *Id.*  A fair recitation of this record in a case involving fibromyalgia
    – with depression one of its "most common symptoms" (*see* p. 3, *supra*) – would point
    out that "fibromyalgia" was the treating doctor's "primary diagnosis" — particularly
    where the insurer has promised to pay without limitation if the physical condition is
    disabling, regardless of concurrent disabling mental health conditions.  SR 26.

    Further, remarking on an *anticipated* return to work date of 1/6/14, Dr. Durtschi noted,
    "medical leave required for disabling symptoms and therapeutic interventions," including

**PLAINTIFF'S RESPONSE/REPLY - p. 18 of 34**          Megan E. Glor, Attorneys at Law
                                                      707 NE Knott Street, Suite 101
                                                      Portland, OR  97212, 503-223-7400

PT, sports massage, exercise program, talk therapy and clinic visits. SR 663. His treatment plan consisted of **four** interventions to address only physical symptoms.

Standard omits Dr. Durtschi's November 5, 2014 Certification of Health Care Provider form. SR 1903-04. He noted Wright's condition began "prior to 2012" and had a "[p]robable duration" of "lifetime." SR 1903. Asked to "[d]escribe other relevant medical facts," Dr. Durtschi noted, "symptoms of chronic pain and anxiety." *Id.* He predicted a treatment schedule of up to five appointments per week, "episodes of severe and debilitating pain" approximately four times per month with "periodic flares, resulting in the need to miss work" and "at times she will be able to attend part day." SR 1904 (emphasis in original).

- **December 2014. Standard asserts:**

    On December 11, 2014, Wright expressed to Dr. Durtschi that "she feels she is not likely to be ready to return to work at the end of this period of leave." (AR 576-577). Notably, Dr. Durtschi did not conclude that she was incapable of working, "[s]he is strongly encouraged to further discuss question of disability with her psychologist... [*Id.*]

Def. Mot., p. 10.

    A review of the record provides context. Dr. Durtschi described Wright as a "58 year-old woman with **fibromyalgia, complicated by** depression and anxiety, worsened significantly by work stressors." SR 577 (emphasis added). He noted she was "Currently on short-term leave" and stated, "It will be very difficult for her to return to work at the end of the leave, although decision regarding how to proceed at that point is still pending." *Id.* His plan included nine approaches, eight of which directly addressed her physical symptoms (pain psychologist, sports massage, yoga, water therapy, medication, planned trigger point injections and follow up). *Id.*

    Given the disabling nature of Wright's chronic pain, one would expect consideration of any return to work to be a topic of discussion with the treating psychologist, as Dr. Durtschi suggested. *Id.*

    Inexplicably, Standard omits from its Motion discussion of Wright's December 1, 2014 evaluation by OHSU's Fibromyalgia Clinic. SR 516-20. *See* Pl. Mot., pp. 4-5. Wright reported "widespread and migratory pain," ranging from 4 to 9/10, described as "achy and sharp,"

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

improved by hot baths and aggravated by stress, with stiffness following prolonged inactivity.

SR 516.  A review of systems was positive for, *inter alia*, fatigue, sleep problems, chronic IBS

symptoms, frequent headaches, dizziness, imparied coordination and cognitive difficulties.  *Id.*

"18 of 18 tender points" were tender to palpitation.  SR 518.  Wright was "unable" to perform

heel and toe walking and her tandem and her gait was "unsteady."  SR 519.

   The Clinic confirmed the fibromyalgia diagnosis (*id.*) and made numerous treatment

recommendations, including a TENS unit for "moderate fibromyalgia pain and dysfunction," a

sleep study, given "long history of non-restorative sleep and daily issues with fatigue" and the

fact "many patients with fibromyalgia additionally suffer from treatable sleep disorders",

counselling "for both learning to manage life with chronic pain as well as her other stated life

stressors", vitamin D for myalgia, arthralgia and fatigue, trigger point injections ("useful in

controlling the pain" and "part of the 'multi-disciplinary approach' of pain management that we

recommend in fibromyalgia"), a daily, gentle exercise program, and a "[r]eview of literature,

highlighting current understanding of the physical nature of fibromyalgia."  SR 519-520.  *See* Pl.

Mot., pp. 20-21.

- **December 2014.  Standard asserts:**

    Wright visited with a neurologist, Dr. Daniel Friedman, on December 31, 2014, **to follow
    up on her history of lifelong headaches.** (AR 617-618). Dr. Friedman noted "**some
    numbness in her hands** as well as loss of balance," recommending an MRI. (*Id.*) At her
    follow up appointment with Dr. Friedman on January 22, 2015, he noted that the MRI
    showed no evidence of significant spinal stenosis in the cervical spine. (AR 615). **He
    also noted that she does have foraminal narrowing and he recommended trying
    wrist splints to see if it helps.** (*Id.*) (emphasis added).

Def. Mot., p. 11 (emphasis added).

    Actually, while Wright **reported** a lifelong history of headaches, she saw Dr. Friedman
    **because of** an onset of frequent, severe headaches: "She is now having headaches 3-4
    times a week," "right-sided head pain which is explosive," at "8/10." SR 617. He

**PLAINTIFF'S RESPONSE/REPLY - p. 20 of 34**          Megan E. Glor, Attorneys at Law
                                                      707 NE Knott Street, Suite 101
                                                      Portland, OR  97212, 503-223-7400

diagnosed migraine with aura. SR 618. Dr. Friedman found Wright to be a good historian. SR 617.

Dr. Friedman referred Wright for an MRI to rule out myelopathy (SR 618) and the negative result simply confirmed the migraines were not the result of a myelopathy. At the follow-up appointment, Dr. Friedman treated two separate conditions, headaches and hand numbness (SR 615), which Standard conflates. Standard omits that he recommended titrating gabapentin to address frequent and severe migraine. He recommended wrist splints for the hand numbness. SR 616.

- **February 2015. Standard asserts:**

On February 6, 2015, in a follow up appointment with Dr. Durtschi, Wright complained of "widespread pain" and feeling "completely unable to return to work." (AR 582). She also noted that she "hopes to be approved ultimately for Social Security disability." (*Id.*) Dr. Durtschi summarily determined that "she remains completely unfit to return to work" due to **"debilitating fibromyalgia and chronic pain, complicated by chronic insomnia, depression, and ADD."** (AR 584).

Def. Mot., p. 12 (emphasis added).

Actually, Dr. Durtschi **observed** that Wright was in "[a]pparent discomfort," "frequently shifting position and rubbing arms and legs." SR 584. He also documented intermittent GI problems as well as hand numbness and tingling. SR 582.

Having treated Wright for years, Dr. Durtschi was aware of the progression of her symptoms and diseases. He was well qualified to determine "she remains completely unfit to return to work" due to "debilitating fibromyalgia and chronic pain, complicated by chronic insomnia, depression, and ADD." SR 584. He did not "summarily" determine she remained disabled. His statement Wright "is now working with a disability attorney, and hopes to be approved ultimately for [SSDI]" (AR 582) reflects his assessment his patient was unable to work and that her LTD and SSDI claims were appropriate. Making such an assessment over time is precisely what treating doctors do.

Standard's mischaracterizations continue:[7]

- **May-June 2015. Standard summarizes physical therapy notes, asserting:**

Between May and June 2015, Wright visited her physical therapist, Ms. Swanson, five times. In her progress and therapy notes, Ms. Swanson noted that: **Wright continued to feel pain**; she was not exercising; she was able to complete household tasks such as cleaning but that **it hurt due to not pacing herself**; she helps care for two of her grandchildren; and she is able to do "fun things with friends" to feel better. (AR 475).

---

[7] Standard's mischaracterization of Dr. Green's opinion (Def. Mot., pp. 34-35) is addressed on pp. 32-33, *infra*.

**PLAINTIFF'S RESPONSE/REPLY - p. 21 of 34**

Ms. Swanson emphasized...the "importance of avoiding flare ups but staying active" by learning to pace herself. (AR 481). Her conclusion was that with proper stretching, exercise, and physical therapy, Wright "demonstrates good potential to achieve established goals to address the documented impairments by participating in skilled physical therapy services." (AR 467).

And indeed, Wright told Ms. Swanson she "felt more relaxed" and "less focused on pain," **noticing improvements in her pain level when she paced herself.** (AR 457). Wright was able to walk for several days on the beach "**with less pain** and definitely less limping." (AR 449). She continued to struggle with mental tasks, however, such as "time management and managing appts" which led to her missing her aquatic therapy class and not scheduling recommended yoga and persistent pain classes. (*Id.*) Ms. Swanson continued to report that Wright would show improvement "if she can be consistent with her physical therapy appts and follows through with taking the persistent pain class and doing her HEP [home exercise program]." (AR 454).

Def. Mot., p. 14-15 (emphasis added).

*First*, Standard includes vague statements about Wright's pain (bolded), but omits copious documentation that the pain continued to be disabling. For example:

- o Visit 1 (5/6/15):
  - "Presents to PT with signs/symptoms of fibromyalgia and **long hx of persistent pain**." The "Primary functional goal" on a Pain Disability Index (PDI) was a score of 33 or less; Wright's score was 45. The PT goal for Wright on a scale of family/home responsibilities was ≤ 3/10 whereas Wright was currently at 8-9/10. SR 471 (emphasis added).
  - "**Hurts 'all over'-bilateral knee pain R.L, bilateral feet and ankle pain.** Dx'd with **fibromyalgia, arms, neck, head pain.** Has GI issues. Had hernia and still has pain from prev. surgery." SR 475 (emphasis added).
  - "**Has 'always' had pain but 'just keeps going.'**" "Currently gets HA's daily. Couldn't get out of bed on Friday due to HA. HA's start with pressure and pain in upper trap region and the 'move up' to head." SR 476 (emphasis added).
  - **Positive shoulder pain tests**: "supraspinatus, biceps, etc. ARE tender" (but "not consistent with impingement.") SR 479.

- o Visit 3 (5/19/15): Felt much better after previous treatment, noticing improvements with pacing. SR 457.

- o Visit 4 (6/9/15): Wright's PT score remained nearly the same at 8/10 (with a goal of ≤ 3/10); an additional PT goal was added: "**Be able to walk a flight of stairs foot over foot without difficulty or increased pain**" but was "not met." SR 450 (emphasis added).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

    o  Visit 5 (6/25/19): "**Increase back pain due to recent fall.**" SR 437 (emphasis added). Wright's rehabilitation potential remained "fair." SR 439.

*Second*, Standard paints a picture of someone more functional than Wright was. For example, within the PT note from which Standard cherry picks that Wright had much less limping and took several beach walks, PT Swanson also noted, "Lots of pain everywhere today" and a "PDI score" of 52 ("worse than previous" score of 45). SR 447.

*Third*, while it is true PT Swanson noted on June 9 that Wright "would show improvement 'if she can be consistent with her physical therapy appts and follows through with taking the persistent pain class and doing her HEP [home exercise program]," Standard omits that Ms. Swanson had found Wright's rehabilitation potential to have declined by this time, from "good" (noted on SR 482 (5/6/15), 463 (5/12/19), 458 (5/19/15)) to "fair." SR 449 (6/9/15), 439 (6/25/15) (potential for rehabilitation, "by participating in skilled [PT] services" "fair.").

- **Sept-October 2015 (PT).  Standard asserts:**

    Wright began her first [PT] visit [5/6/15] reporting severe pain radiating down her back and leg, taking almost double her prescribed oxycodone medication (up to ten pills per day) after three weeks of physical therapy reported that her pain was significantly improved and she had returned to her prescribed amount of six oxycodone pills per day. (*Id.*) [AR 357-76].

Def Mot., p. 16.

    The PT records actually confirm Wright had an onset of sciatica around early September and that by mid-October she had returned to her baseline level of chronic pain:

    o  9/23/15: "Severe pain started 3-4 wks ago in L hip, groin, leg.  Tingling and numbness all 10 toes...now using cane to walk." SR 369.  "Pain is worse with standing...Tries to get up every 30 min to do something around the house, does stretches, etc. Limited to no more than 1hr sitting max. Limited to no more than 5-10 min of standing walking." SR 370.  "Severe pain 10/10 [in] L hip radiating down L leg really deeply into ankle." *Id.*  Most lumbar exercises induced pain. SR 370-71.  "Three weeks ago she started having severe L leg pain for no particular reason which is consistent with the dx of central sensitization." SR 375.

    o  9/30/15: "Pain so much improved. **6/10. Pain still radiating down leg.**" SR 361. (emphasis added)

    o  10/13/15: "Doing very well, feels like her pain is much more manageable and **back to the way it was prior to the sciatica pain. Daily pain 6-7/10.** SR 358. (emphasis added).

    Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

Standard's downplaying of Wright's chronic pain, highlighting of intermittent activity to imply Wright was more functional than she was, continues through the close of the record:

- **February 2016.  Standard asserts:**

    ...on February 8, 2016, on a routine follow up appointment with Dr. Durtschi, Wright continued to report difficulties with her sleep and feeling depressed. (AR 277- 279). She described being able to remain lightly physically active during the day "with doing household tasks, sorting mail, etc." but that she could not think of any enjoyable recreational activities or hobbies she enjoyed doing. (*Id.*) She identified "significant financial stressors" because her husband might be losing h[is] job. (*Id.*) Her sleep disorder physician, Dr. Ramseyer, recommended behavioral changes and that it was helping her "get[] out of bed at more consistent hours." (*Id.*)

Def Mot. p. 17.

    The sleep and mood difficulties and lack of enjoyment Standard admits are in the context of what Standard omits: "She feels...achy, uncomfortable...admits that pain has perhaps been worse since our last visit." SR 277.  On exam, Dr. Durtschi noted Wright "appears uncomfortable," "[s]hifting frequently in her seat.  Rubbing her thigh muscles and arms." He assessed her with chronic fatigue and malaise, fibromyalgia, chronic pain disorder, MDD (recurrent episode, in partial remission) and ADD.  SR 279.

- **March 2016.  Standard asserts:**

    On March 9, 2016, Wright met with Dr. Durtschi to review her abdominal pain, which had improved with a course of antibiotics, but symptoms then recurred. (AR 284-286).

Def Mot. p. 18.

    The single sentence about this appointment creates the illusion Wright had a recurrent stomach ache.  Wright described her pain as "somewhat similar" to the pain she knew well from her "history of pancreatitis." SR 284-85.  *See also* Pl. Mot., p. 7.  On exam, Dr. Durtschi found "mild periumbilical and lower quadrant tenderness, a little worse on the right, with mild guarding." SR 285.  He assessed "[c]hronic pain and fibromyalgia, continues to be disabling," and renewed oxycodone, and encouraged Wright to continue treatment with her pain psychologist.  SR 286.

    Standard also fails to discuss gastroenterologist Dr. Sleven's April 1, 2016 evaluation, which further clarifies the context and scope of Wright's symptoms.  He noted Wright's "abdominal symptoms...have all gotten worse." SR 119.  He noted Wright had had significant improvement after a course of Xifaxan the prior summer, which had lasted for about 6 weeks, when "she again began noticing worsening symptoms. *Id.* He noted that, since February, Wright had been having major changes in bowel symptoms, and described them.  SR 119-120.  While recent CT scan results did not explain the pain, he

**PLAINTIFF'S RESPONSE/REPLY - p. 24 of 34**        Megan E. Glor, Attorneys at Law
                                                     707 NE Knott Street, Suite 101
                                                     Portland, OR  97212, 503-223-7400

noted Wright "is chronically in pain in her abdomen." SR 120. He concluded she had "a number of overlapping problems that could contribute to her digestive complaints," including previously diagnosed IBS, her post-operative bypass state, and possible bacterial overgrowth in the excluded segment. SR 121. He prescribed a course of Xifaxan. *Id. See also* SR 287.

- **April 2016. Standard asserts:**

  By April 20, 2016, Wright's abdominal pain had improved with another course of an antibiotic, Xifiaxan. (AR 288-290)[8]. She also reported an improved sleep schedule and reduced chronic fibromyalgia pain. (AR 288). Dr. Durtschi encouraged her to continue "engagement with hobbies and modest physical activity within her limitations" and he reduced Wright's gabapentin dosage, her fibromyalgia medication. (AR 289). Wright also continued receiving trigger point injections during this time, which she felt provided good relief. (AR 290).

Def. Mot., p. 18.

Contrary to the overall, dramatic improvement Standard's summary implies, Dr. Durtschi documented "[c]hronic back pain and fibromyalgia" and noted "Symptoms have been **slightly** better with the warmer weather." SR 287 (emphasis added).

It is accurate that Dr. Durtschi reduced Wright's gabapentin dose (from 3600 mg per day to 1,800 mg per day) in April (SR 285/289), but Standard omits important history. In January, he had discussed with Wright reducing gabapentin in the hope of improving her sleep problems. SR 275. However, he had noted his concern reduction "may have the opposite effect as it probably is providing her some benefit in terms of her pain." *Id.*

By April, Wright had started "reducing gabapentin." SR 287. Dr. Durtschi noted "she would like to reduce medications if possible, and **hasn't really noticed any increase** in symptoms." (i.e. since starting reduction on her own). *Id.* (emphasis added). Thus, the reduction in April was something Dr. Durtschi had hoped would be possible, something Wright embraced, and something that, fortunately, did become possible given that she felt little change in her pain after reducing the medication in the intervening months.

Dr. Durtschi did renew Wright's oxycodone (SR 289) and, as Standard admits, Wright also continued to receive trigger point injections, an unpleasant treatment one would avoid if not necessary to manage their pain. SR 290. It is true Wright reported that the injections helped, but she also continued to experience unmanageable pain in the ensuing months for which she received additional trigger point injections.

- **May 2016. Standard asserts:**

  On May 25, 2016, Wright followed up with Dr. Durtschi. (AR 293-295). **She reported**

---

[8] The correct citation is AR 287-289.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

> **that her chronic conditions were all stable** and that she and her husband "recently took
> a road trip through the Southwest which she really enjoyed." (*Id.*) She informed Dr.
> Durtschi that she would not be able to continue monthly office visits due to health
> insurance changes. (*Id.*) Her husband was laid off from his job the previous day and
> would be on "catastrophic coverage." (*Id.*) Dr. Durtschi confirmed that if Wright's
> conditions continued to remain stable, she could wait six months before returning for a
> follow up visit and then in a year. (*Id.*)

Def Mot., p. 18-19 (emphasis added).

> The "history of present illness" section of the May 25 report (SR 293) shows
> Wright reported how each chronic condition was progressing. Dr. Durtschi
> assessed her chronic problems as largely stable (her GAD, had been "a little
> worse recently" (SR 295)) and noted she could reduce frequency of her office
> visits. The primary reason for the reduction in visits, however, was Wright's **loss
> of medical insurance coverage.** *Id.* The fact the chronic conditions were stable
> does not mean they were not disabling.

- **Standard asserts** that Dr. Kaur provided pain management treatment in 2016 and 2017,
  including medications, trigger point injections and a TENS unit. Def. Mot., pp. 20-21,
  22. Standard discusses numerous medication changes and Dr. Kaur's instructions to
  Wright to avoid treating her pain with marijuana or (previously prescribed) oxycodone.
  *Id.*

  Dr. Kaur's records highlight the dilemma of chronic pain and its management. Wright
  was miserable with pain and had suffered side effects common with long-term
  medication treatment, including fatigue, cognitive symptoms, GI problems, headaches,
  and an increasing tolerance for the medications, resulting in increasing doses. SR 265,
  268, 249, 245. Wright expressed a desire to reduce her medications (e.g. SR 287), yet
  struggled as she needed them for her otherwise unmanageable pain.

  Dr. Kaur treated Wright with trigger point injections through the close of the record. *See*
  Pl. Mot., pp. 9-10. She never suggested Wright was overreporting her symptoms or that
  she was not credible. Indeed, she noted in December 2017, after prescribing a fentanyl
  patch (SR 268) and increasing the dosing several times (SR 261-64, 257-60, 255), "this is
  likely the best relief she can get from opioid medications." SR 249.

  If the final medical report in the claim file, Dr. Durstchi's January 2018 letter, appears

"impassioned," it is likely because he knew Standard was ignoring a lengthy medical record of

chronic and disabling pain. *See* AR 1219-20; Pl. Mot., pp. 12, 22-24.

// 

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

    **d. Standard abused its discretion by asserting Wright's claim was subject to the Mental Disorder limitation.**

  Standard's failure is all the more egregious given its assertion that Wright's claim is

limited to 24 months of benefits under the policy's Mental Disorder Limitation.  As discussed,

Standard failed to analyze or consider the conclusions of OHSU's Fibromyalgia Clinic and

psychiatrist Dr. Creedon.  It also utterly failed to address Dr. Green's January 2018 letter,

submitted with Wright's appeal, explaining that "the conclusion that her disability is the result of

Somatic Symptom Disorder or her mental health generally is patently incorrect", that Wright "no

longer even meets the diagnostic criteria for Somatic Symptom Disorder" given a change in the

diagnostic criteria for that condition in the DSM-V", and that "Wright's psychological response

to her disabling physical conditions is not now, nor has it ever been, disproportionate or

excessive." SR 1221.  Dr. Campo, the only consultant Standard engaged to review Wright's

appeal, not only failed to examine Wright, but explained his review covered only "physical

symptoms, complaints and findings, aside from mental health complaints" (SR 1393) and he did

not analyze Dr. Green's January 2018 letter." SR 1393-1401. *See* p. 33, *infra*.

    **1. Standard's assertions that it considered Wright's claim a MH claim and warned her of that fact are self-serving and arbitrary.**

  The fact Standard asserted in internal notes and letters that Wright's claim was subject to

the policy's Mental Disorder Limitation is irrelevant to whether the Limitation applies. *See* Def.

Mot., p. 21.[9]  Standard, the fiduciary, had a duty to apply the policy's terms correctly, touse

appropriate expertise and to fairly review the record.  Standard's warnings and assertions in its

---

[9] Standard's STD to LTD rollover form says nothing about a mental disorder, but states as the reason Wright's claim was rolling over to LTD, "EE has fibromyalgia and didn't RTW on the original ARD [anticipated return date]." SR 973.  It's initial LTD claim overview form states fibromyalgia as Wright's diagnosis. SR 93 (1/21/15).

**PLAINTIFF'S RESPONSE/REPLY - p. 27 of 34**
        Megan E. Glor, Attorneys at Law
         707 NE Knott Street, Suite 101
        Portland, OR  97212, 503-223-7400

claim file and Motion that it considered Wright's disability to be subject to the Mental Disorder limitation are self-serving and arbitrary.[10]

> ### 2. Wright's treating psychologist, Dr. Green, told Standard in her 2015 and 2016 letters that Wright's therapy had focused upon "pain and factors that exacerbate pain."

Wright began treating with psychologist Dr. Green in October 2014. SR 626. Dr. Green wrote three letters to Standard describing the nature of therapy and her observations. *Id.* (1/2015), SR 1943 (4/2016), 1221 (1/2018)[11]. Standard never had any consultant review Dr. Green's third letter, which Standard argues contradicts the prior letters. Dr. Green's letters are entirely consistent with the medical record.

In her first letter, Dr. Green explained that she was "unable to speak to whether or not [Wright] continues to qualify for disability given that I am her treating psychologist rather than an independent disability evaluator." AR 626. She stated she would, however, "like to share [her] perspective regarding [Wright's] situation..., which may assist the evaluation team in making a determination..." *Id.* Dr. Green explained that the focus of the treatment was "chronic pain and factors which exacerbate pain (e.g. stress and adjustment to medical disability)." *Id.* She noted Wright "has been diagnosed with a number of painful conditions, per my review of her medical record from Dr. Durtschi," and listed them. *Id.* She stated her diagnoses: "[MDD], Recurrent, Moderate; Somatic Symptoms Disorder, with Prominent Pain, Persistent, Moderate; Generalized Anxiety Disorder, Chronic; and Insomnia Disorder." *Id.* She noted she had reviewed the Fibromyalgia Clinic's records and had "noted that Fibromyalgia is currently thought of to be a Central Sensitivity Syndrome, and as such requires a multi-modal approach to

---

[10] *See* FN 4, p. 8, *supra.*
[11] The fact Wright did not have Dr. Green submit chart notes is immaterial given that she summarized her opinion in three letters.

PLAINTIFF'S RESPONSE/REPLY - p. 28 of 34

treatment" and that "a substantial, and growing, body of research supports the use of psychotherapy and exercise in management of Fibromyalgia." *Id.*

In her second letter (4/2016), Dr. Green explained she continued to treat Wright "every other week or so to address her adjustment to disabling medical conditions, including a number of painful medical conditions." SR 1943.

Dr. Green's observations and assertions are consistent with the fact fibromyalgia typically characterized by chronic physical symptoms (pain, fatigue, GI problems, insomnia) and chronic mental health symptoms (depression, anxiety). *See* p. 10, *supra* (citing case law, ACR, Mayo Clinic, SSA, CDC) and Pl. Mot., pp. 20-21.

Her statement in her first letter that "[i]t is important not to characterize chronic pain as being '*either* medical *or* psychological' but rather a situation wherein both medical and psychological factors can exacerbate, maintain, and/or reduce symptoms") is consistent with fact the disease involves both physical and psychological symptoms. AR 626 (emphasis in original). So too are her statements that "Wright's condition is thought likely to improve with treatment...[g]iven her report of a variety of stressors affecting her current pain symptoms, including occupational and medical stressors" and that "her pain flare may continue until stressors abate." *Id.* All of these statements mirror the common sense notion that changes (for the better or worse) in medical factors (physical symptoms, medication side effects, injuries, etc.) and psychological factors (stress, anxiety-producing events, losses, etc.) can result in improvement or decline of both physical health and mental health.

/ /

/ /

/ /

**PLAINTIFF'S RESPONSE/REPLY - p. 29 of 34**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212, 503-223-7400

### 3. File review psychiatrist Dr. Gwinnell (2015) reached implausible, arbitrary conclusions.

Standard's psychiatric consultant, Dr. Gwinnell (April 2015), noted some of Wright's physical symptoms, including severe neck and shoulder pain, severe headaches, abdominal distress and all over body pain. SR 485, 486. She also documented sleep and cognitive problems. SR 487. Dr. Gwinnell also admitted Wright "has already demonstrated significant chronicity to her fibromyalgia, pain complaints..." and " continues to experience substantial symptomatology" despite having been off work for five months. SR 488. Based upon her record review, she asserted that "depression, anxiety and somatic symptom disorder have had a significant negative effect" on Wright's function. SR 488. Her summary of the medical record supports that Wright was suffering from disabling pain, sleep problems and cognitive problems five months after leaving work.

In responding to Standard's request to "outline [Wright's] limiting condition," Dr. Gwinnell ignored the nature of fibromyalgia as well as material facts. SR 487. She asserted that in Dr. Maron's testing, Wright had "demonstrated some significant impairments which were felt to be related to the intrusion of depression and anxious symptoms into cognitive dysfunction," which, Dr. Maron noted, would cause "difficulties in day-to-day function due to these cognitive findings." AR 487. Actually, Dr. Maron found Wright's neuropsychological profile "most notable for inconsistent performances," which she concluded were "most likely related to emotional distress **and pain**." SR 530 (emphasis added). She also observed obvious signs that Wright was experiencing pain, including an inability to "get comfortable in her chair," rubbing of her body, grimacing, closing her eyes tightly and sighing. *Id.*

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

The relevant issue regarding Wright's entitlement to reinstatement of her claim is whether her reports of disabling physical symptoms constituted a disproportionate response to her condition when Standard terminated her claim in July 2017. Dr. Gwinnell could not rationally address that issue, not only because she never reviewed records after April 2015, but also because she never met Wright and thus had no reasonable basis to make the observations necessary to weigh in on the plausibility of her pain reports.

> **4. Standard abused its discretion by relying upon file review psychiatrist Dr. Grant's assertions (2017) in terminating Wright's Claim.**

Dr. Grant never met Wright and offered no reasonable basis for her brief conclusion in her May 2017 report. SR 107. She stated she had "reviewed all of the available records since" Dr. Gwinnell's April 2015 review and she summarized part of subsequent reports, but did not analyze Wright's longitudinal medical record. SR 105-106. She did not address the nature of fibromyalgia or the OHSU Fibromyalgia Clinic's conclusions. She cherry-picked statements confirming that Wright suffers from depression and anxiety. AR 105-106. Even then, she never analyzed pertinent statements she had selected, such as that Dr. Green had told Dr. Durtschi she "believes [Wright's] depressive symptoms are more attributable to a sleep problem than depression." SR 105.

She recited that Wright had been put on strong pain medications by her pain specialist, Dr. Kaur, and had an antalgic gait (walking with a shortened stride avoid creating pain) (SR 106), yet never analyzed these facts. She noted sleep problems (*id.*), but never analyzed the issue in the context of a patient who suffered a host of physical illnesses. Dr. Grant recited various medications and noted medication side effects (*id.*) but, again, never analyzed the whole of Wright's symptomatology. Like Dr. Gwinnell, she was not in a reasonable position to make an

**PLAINTIFF'S RESPONSE/REPLY - p. 31 of 34**

assessment regarding the plausibility of Wright's reports, whether they were consistent with her

fibromyalgia diagnosis, or whether they were in proportion to her long list of medical diagnoses.

The implausibility of Dr. Grant's conclusions is perhaps best highlighted by her

statement that "Ms. Wright would appear to meet the criteria for somatic symptom disorder,

primarily pain." SR 107. Pain, of course, is the primary symptom of fibromyalgia, the condition

diagnosed by the providers who had actually treated Wright, including OHSU's specialty clinic.

> **5. Dr. Green's observations and conclusions in her January 2018 letter further support the 24-month limitation is inapplicable to Wright's claim.**

Dr. Green stated in her final letter, "I understand that you have concluded that Ms.

Wright is unable to work because she has a mental health disorder," and refuted the assertion.

SR 1221. She explained that "the conclusion [Wright's] disability is the result of Somatic

Symptom Disorder or her mental health generally is patently incorrect." *Id.* Standard argues

that these assertions conflict with her prior statements, ignoring Dr. Green's explanation of the

basis for her assertion. Def. Mot., p. 34.

First, she stated that "due to the change in the diagnostic criteria," Wright "no longer

even meets the diagnostic criteria for Somatic Symptom Disorder." *Id.* She explained that she

had diagnosed a Somatic Symptom Disorder under the earlier criteria "because she had

significant health issues...and adjusting to those issues is understandably challenging for her."

*Id.* She added, "another way to describe that condition is to call it an Adjustment Disorder." *Id.*

She explained that under "the new DSM-V, this disorder has been conflated with

Hypochondriasis and Conversion Disorders" which do not describe Wright. *Id.*

Dr. Green, who had observed her patient over more than three years by the time she

wrote her January 2018 letter, concluded by explaining that the new criteria require that the

**PLAINTIFF'S RESPONSE/REPLY - p. 32 of 34**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212, 503-223-7400

patient have "a disproportionate response to symptoms or excessive concerns about one's health" and that Wright "does not meet that definition." *Id*. She reiterated, "Ms. Wright's psychological response to her disabling physical conditions is not now, nor has it ever been, disproportionate or excessive. She is in pain all of the time." *Id*.

Standard did not have a mental health (or any) professional review Dr. Green's letter, despite its longstanding assertion the Mental Disorder Limitation applied. Standard's failure to analyze Dr. Green's letter also violated ERISA's "full and fair" review claim regulations. 29 CFR § 2560.503-1(h) requires Standard to, with respect to the Plan, "...maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination" *Id*. § (h)(1) and provides that such review must "take[] into account all comments, documents, records, and other information submitted by the claimant..." *Id*. § (h)(2)(iv). Standard's failure to analyze Dr. Green's letter is further evidence it abused its discretion.

### e. Standard abused its discretion by relying upon Dr. Campo's file review (2018) in denying Wright's appeal.

Plaintiff's Motion addresses the implausibility of internist Dr. Campo's 2018 file review, including: his omission of an analysis of the medical record; his arbitrary disregard of his own multi-page summary of the medical record, the nature of fibromyalgia, and Dr. Durtschi's well-supported opinion; and his own nonsensical assertions. Pl. Mot., pp. 28-29. Dr. Campo admitted "Dr. Durtschi was somewhat persuasive in his assessment of the claimant's inability to work from his perspective" yet failed to analyze "the totality of the medical documentation" that he purported to have "reviewed" in asserting it "is not supportive of preclusion of capacity for sustained gainful activity at a sedentary or light level." SR 1400.

Standard quotes from Dr. Campo's file review (Def. Mot., p. 28), but avoids *analysis*.[12]

Standard's only comment regarding Dr. Campo's opinion is an assertion that he "reaffirmed" the

conclusion reached by Dr. Fraback in 2015 that "Wright was able to return to work in her prior

position as long as it was for a different company." Def. Mot., p. 39; *See* p. 11, *supra* (showing

Dr. Fraback's conclusion was arbitrary and, thus, irrelevant).

Standard's decision was "illogical", "implausible" and "without support in inferences that

may be drawn from the record and thus, an abuse of discretion. *Salomaa, supra,* 642 F.3d at 676

(citing None of Standard's consultants rationally assessed Wright's entitlement to disability

benefits in light of her medical record and the policy's promise to pay benefits because she

suffers from disabling chronic pain.

### III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant her Motion

and deny Defendant's Motion.

DATED:   January 27, 2020.

Respectfully Submitted,

MEGAN E GLOR ATTORNEYS AT LAW

*s/ Megan E. Glor*
Megan E. Glor, OSB #930178
Attorneys for Plaintiff

---

[12] Dr. Campo's name appears four times in Standard's Motion (three times in one paragraph on page 28 and once on page 39).

**PLAINTIFF'S RESPONSE/REPLY - p. 34 of 34**